Potter Electric Signal and Manufacturing Company, a corporation v. Commissioner.
Potter Electric Signal & Mfg. Co. v. Commissioner
Docket No. 65426.
United States Tax Court
T.C. Memo 1960-30; 1960 Tax Ct. Memo LEXIS 259; 19 T.C.M. (CCH) 160; T.C.M. (RIA) 60030; February 26, 1960
*259 Held, that rents paid by petitioner to its principal stockholder in excess of $10,200 per year plus insurance, taxes and upkeep, were not reasonable and were not required to be made within the meaning of section 23(a)(1)(A), Internal Revenue Code of 1939, for the years 1950, 1951, and 1952. Held further, that petitioner is entitled to an interest deduction for the years 1950, 1951, and 1952, with respect to certain notes it issued at a discount in March 1949. Selden Blumenfeld, Esq., 418 Olive Street, St. Louis, Mo., and Tennie C. Leonard, Esq., for the petitioner. William H. Welch, Esq., and H. Tracy Huston, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: This proceeding involves deficiencies in income tax for the years and in the *260 amounts as set forth below: Year
Deficiency
1950
$ 1,723.85
1951
11,293.58
1952
14,603.51
The issues for decision are: (1) Whether petitioner is entitled to deduct amounts in excess of $10,470.94, $10,534.78, and $10,193.71 for the years 1950, 1951, and 1952, respectively for the continued use and possession of the property at 1211-1213 Pine Street, in St. Louis, Missouri; and (2) whether petitioner is entitled to an interest or amortization of discount deduction in each of the taxable years with respect to certain notes it executed in March 1949. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Potter Electric Signal and Manufacturing Company (hereinafter referred to as petitioner) is a corporation organized under Missouri law on March 18, 1916. It filed its corporation income tax returns on an accrual basis for the taxable years 1950 and 1951 with the collector of internal revenue for the first district of Missouri, St. Louis, Missouri, and for the taxable year 1952 with the director of internal revenue, St. Louis, Missouri. Petitioner is engaged in the business of installing, maintaining and servicing *261 burglar alarm systems, fire alarm systems, and other protective signaling systems; and of furnishing burglar alarm, fire alarm, sprinkler system and night watchman supervisory service to its subscribers by means of electronic devices connected by telephone wires to a central control station maintained and operated by petitioner; and in the business of manufacturing, assembling, buying and selling various devices and component parts required in the manufacture, operation, and maintenance of burglar alarm, fire alarm, sprinkler and night watchman supervisory systems and other protective signaling systems. Petitioner's original authorized capital was $150,000, divided into 1,000 shares of $100 par value common stock and 500 shares of $100 par value preferred stock, of which 559 shares of common stock and 365 shares of preferred stock were issued. Until July 9, 1948, Charles E. Potter, petitioner's founder and long-time president, owned all of the 559 shares of common stock and 300 shares of the preferred stock. Ida L. Potter, wife of Charles E. Potter, owned 60 shares of the preferred stock, and Flora Sullivan owned the remaining 5 shares. On July 9, 1948, Charles E. Potter executed *262 a revocable Indenture of Trust whereby he assigned, transferred and delivered to himself and M. E. Turner, as trustees, and to their successors in trust, the said 559 shares of common stock and 300 shares of preferred stock, to be administered as two separate trusts, each comprised of one-half of said stock, to each of which was later added certain life insurance policies and cash. Turner was a professional trustee and a director of the Guaranty Trust Company of Missouri. Charles E. Potter died October 11, 1948, and was succeeded as trustee by his widow, Ida L. Potter, and the Guaranty Trust Company of Missouri. Ida L. Potter resigned as co-trustee on June 5, 1951, and was succeeded by Rita Potter Trigg, the grantor's daughter. M. E. Turner died January 14, 1952. The trust indenture contains no provision for succession to him. Since his death, the Guaranty Trust Company of Missouri and Rita Potter Trigg have been acting as trustees under the trust. The trust indenture provided for the payment of the entire net income of the trust estates to Charles E. Potter during his lifetime. Upon his death Ida L. Potter was to receive the net income from one of the trusts, with power of appointment *263 as to the remainder thereof. Should Ida L. Potter fail to exercise her power of appointment, the principal of the first trust was to be divided into two shares and the net income therefrom paid to the grantor's two step-daughters (Ida's daughters), Margaret B. McCane and Lidamay Nuderscher, or their children. The income from the other trust was to be distributed to Ida L. Potter within the discretion of the trustees, or to Rita Potter Trigg, grantor's daughter, or her children, at the discretion of the trustees. Upon the death of Rita Potter Trigg the remainder was to pass to her children. From the date of Charles E. Potter's death on October 11, 1948, until March 1, 1949, the trust for the use and benefit of Ida L. Potter owned 279 1/2 shares of common stock and 150 shares of preferred stock of petitioner corporation. Since before 1936 petitioner had carried on its business on the ninth floor of the Century Building located on Ninth Street between Olive and Locust, in downtown St. Louis. This is a ten-story building, the first eight floors of which are occupied by the Scruggs Vandervoort Barney Department Store, and the ninth and tenth floors are leased as office space. Due to *264 inadequate warehouse and parking space, certain disagreements with the lessor, and its inability to conduct manufacturing operations to the fullest extent desirable, petitioner, in 1946, decided to look for new quarters. Petitioner was able to negotiate a three-year lease in 1946 only upon the promise that the manufacturing phase of the operations would be removed from the Century Building and that an effort would be made to remove the entire operation. Accordingly, petitioner's president instructed James W. Flotron, Jr. to find new quarters to move into at the expiration of petitioner's lease in 1949. Because of the nature of its business petitioner restricted its search to an area in which it might be close to the main telephone exchange and to the greater concentration of its customers, or users. Adequate parking facilities and warehouse space, facilities for conducting its manufacturing operations and for the location of its control room on or close to the ground floor so as to avoid loss of running time required to respond to alarms, were also considerations. In 1948, after a long search, Flotron found a suitable building at 1211-13 Pine Street, St. Louis, Missouri (sometimes *265 hereinafter referred to as the Pine Street Building). This building was not available for leasing from the then owners and petitioner's officers did not consider it was financially able to purchase the building itself. The Charles E. Potter Trust agreed to purchase the building provided a satisfactory lease could be arranged with petitioner. Accordingly, the building was purchased by the Charles E. Potter Trust from the Essex Investment Company for $75,000. The trust borrowed the entire amount; $50,000 from the Missouri Insurance Company, secured by a first deed of trust on the property, and $25,000 from the St. Louis Live Stock Loan Company, secured by other property of the trust. On the same day that the building was purchased by the trust a 20-year lease was executed by the trust and the petitioner. This lease provided for rental payments as follows: $850 per month for the first five years; $1,000 per month for the next five years; $1,500 per month for the next five years; and $2,000 per month for the last five years, plus 15% of the net profits before taxes for all years. The petitioner was also required to pay taxes, insurance, and upkeep and to make all necessary repairs and *266 improvements to the building. Before the lease was entered into, it was discussed by William T. McCane, petitioner's president and general manager; M. E. Turner, one of the three trustees of the trust; and Flotron, one of petitioner's two vice presidents. The lease was signed on December 27, 1948, by M. E. Turner and C. W. Schlueter, vice president of the Guaranty Trust Company of Missouri, for the trust; and W. T. McCane for petitioner. It was approved at a meeting of petitioner's board of directors on December 14, 1948. Present at the meeting were petitioner's three directors, McCane, Turner, and B. N. Rosene. McCane was Ida L. Potter's son-in-law and lived with her. McCane's wife was also a contingent beneficiary of the trust. McCane left the petitioner's employment in 1951 after he was asked to resign by the Guaranty Trust Company of Missouri. The petitioner did not begin to use the Pine Street Building until some time after January 1949, when it first began to use the building for storing its material. Petitioner did not move its manufacturing department from the Century Building until December 1949; it did not move its general office until January 1951; and it did not move *267 its operating department until July 1954. These delays were occasioned in part by repairs and improvements which it made to the Pine Street property, the perfection and manufacture of new and improved equipment, the fact that it had an opportunity to sell and did sell at a profit some of the new equipment before installing it for its own use, and the necessity for rendering uninterrupted service to its customers. The building at 1211-1213 Pine Street was built in 1918. It was purchased in 1930 by the Essex Investment Company for $200,479.50. At that time the part known as 1211 Pine Street was occupied by the Underwriters Salvage Corporation pursuant to a lease expiring November 30, 1938, at a yearly rental of $2,800, plus taxes and upkeep. When that lease expired, a new lease expiring November 30, 1948, was entered into. This lease provided for a yearly rental of $3,000, plus taxes and upkeep. The Underwriters Salvage Corporation was in the insurance business and therefore wrote its own insurance; the lessor only carried owner's liability insurance. When the lease expired, the Underwriters Salvage Corporation moved out, and, at the time the building was purchased by the trust on *268 December 27, 1948, the 1211 portion was vacant. The 1213 portion was occupied by the Pulmosan Safety Equipment Corporation on December 27, 1948, at a monthly rental of $150. The lessor paid the taxes and insurance for the 1213 portion, but it did not pay the upkeep or make any improvements. The Essex Investment Company was a "family corporation" owned by the Bixby family. In 1948, it was in process of liquidation and the "Internal Revenue Department" was insisting that it liquidate more rapidly. After petitioner leased the 1211-1213 Pine Street Building it made leasehold improvements totaling $44,807.09 by the end of 1952. During the taxable years in issue petitioner claimed the following deductions with respect to the Pine Street leasehold: 1950
1951
1952
Rent
$22,424.15
$29,170.21
$31,319.90
Less rent for other space
9,120.00
8,508.47
5,164.35
Rent for Pine Street Building
$13,304.15
$20,661.74
$26,155.55
Monthly installments
$10,200.00
$10,200.00
$10,200.00
Under percentage provision
3,104.15
10,461.74
15,955.55
$13,304.15
$20,661.74
$26,155.55
Real estate taxes
1,089.15
1,296.75
1,372.75
Building repairs
1,374.73
1,213.98
977.96
Insurance
507.06
524.05
343.00
Totals
$16,275.09
$23,696.52
$28,849.26
*269 For the year 1949 petitioner had accrued $5,642.29 under the percentage provisions of the lease in addition to the $10,200 "base rent." The amounts accrued under the percentage provisions for the years 1949 to 1952, inclusive, were paid in the amount of $13,500 during the year 1952, and $23,000 during the year 1953. The first payment, under the percentage provision, in the amount of $2,500, was made March 26, 1952. During the years 1943 to 1948, inclusive, petitioner incurred the following rent expenses: Century
Bldg.
Warehouse
Total
Year
Space
Space
Rent
1943
$3,342.50
$600.00
$3,942.50
1944
3,570.00
600.00
4,170.00
1945
3,570.00
600.00
4,170.00
1946
4,513.50
710.00
5,223.50
1947
7,344.00
720.00
8,064.00
1948
7,344.00
885.00
8,229.00
The rent paid for the Century Building space was at the following rates: $262.50 per month during the period January 1943 to June 1943;$280 during July 1943; $297.50 per month during the period August 1943 to September 1946; and $612 per month during the period September 1946 to September 1949. The space available for the petitioner in the Pine Street Building was 11,297 square feet, half *270 on the ground floor and half on the second floor. The space occupied on the ninth floor of the Century Building was 5,265 square feet. After the Pine Street Building lease was executed, petitioner continued to occupy the Century Building space, for which it entered into a two-year lease on August 26, 1949. Under the terms of this lease petitioner was required to pay $760 per month, or $9,120 per year, for a portion of the space it had previously occupied, and it made arrangements with the building management to continue occupying the remaining portion on a month-to-month basis, until such time as its facilities could be moved to the new location, at a rental of $190 per month. Thus, after August 1949, petitioner was required to pay rent at the rate of $950 per month, or $11.200 per year, for the same space it had been occupying in the Century Building. Petitioner anticipated an increase in its business after it acquired the use of the Pine Street property, and these anticipations were realized. Its total sales and net income before taxes during the period 1943 to 1952, inclusive, were as follows: Net Income
Year
Total Sales
Before Taxes
1943
$189,851.30
$ 5,468.21
1944
203,254.76
13,626.53
1945
226,153.05
18,169.46
1946
276,800.77
11,791.44
1947
308,032.97
17,002.09
1948
345,780.58
26,639.89
1949
438,532.64
44,431.61
1950
536,931.61
17,590.21
1951
537,493.63
59,283.18
1952
612,187.48
90,414.78
*271 Dividends were paid by petitioner for the years 1943 to 1952, inclusive, as follows: Year
Amount
Date Paid
1943
$ 6,468.00
12-30-43
1944
6,468.00
12-21-44
1945
6,468.00
12-20-45
1946
6,468.00
12- 3-46
1947
6,468.00
1- 5-48 *
1948
6,468.00
12-23-48
1949
None
1950
$12,999.00
2- 1-50
2,476.00
12-19-50
1951
2,476.00
8-15-51
2,476.00
9- 4-51
2,476.00
12-28-51
1952
None
In the notice of deficiency respondent determined that petitioner was "required to pay $7,500 per year in rent," plus taxes, repairs, and insurance in the amounts of $2,970.94, $3,034.78, and $2,693.71, respectively, for the years 1950, 1951, and 1952, "for the continued use of" the property at 1211-1213 Pine Street, and therefore disallowed amounts in excess of $10,470.94, $10,534.78, and $10,193.71 for the years 1950, 1951, and 1952, respectively. At a meeting of petitioner's board of directors held on December 14, 1948, a resolution was adopted authorizing petitioner's vice president *272 to purchase from Flora Sullivan her five shares of preferred stock for $500, either in cash or by giving her a note on demand on or before ten years from date with interest at 7%. Accordingly, Flora's preferred stock was retired on December 31, 1948, by petitioner issuing to her its note in the amount of $500, payable on demand or in ten years with interest at 7%. At the same meeting of the board of directors a resolution was adopted that petitioner's authorized common stock be increased from 1,000 shares, $100 par value, to 1,000,000 shares, no par value, and that all of its outstanding preferred stock be called. At a special meeting of petitioner's stockholders held February 2, 1949, a resolution was adopted authorizing the redemption of all of petitioner's outstanding preferred stock and at the same time another resolution was adopted authorizing the amendment of petitioner's certificate of incorporation so as to increase the number of shares of common stock from 1,000 shares of $100 par value stock, to 1,000,000 shares, no par value. Pursuant thereto petitioner subsequently called for redemption of all of its issued and outstanding preferred stock. On March 1, 1949, it issued *273 its check No. 3282 to Charles E. Potter & Co., a nominee partnership for the trustees of the Charles E. Potter Trusts, in the amount of $30,350 and its check No. 3283 to Ida L. Potter in the amount of $6,070. The preferred stock held by Charles E. Potter & Co. was turned in on March 2, 1949, and check No. 3282 was thereupon released to said Charles E. Potter & Co. Check No. 3283 was held by petitioner until July 19, 1955, when Ida L. Potter turned in her stock, at which time check No. 3283 was voided and was replaced by check No. 14691 in the amount of $6,070, which check was released to Ida L. Potter. At a meeting of petitioner's board of directors held February 2, 1949, resolutions were adopted authorizing petitioner's officers to borrow $36,000 from Mutual Bank and Trust Company and to execute the petitioner's note for said loan, and authorizing the petitioner's officers to sell $54,000 of its notes, payable ten years from March 1, 1949, for the sum of $30,153.60, and that the company set up a sinking fund of $3,000 principal each year and $2,400 interest. Such a sinking fund was never established. On March 1, 1949, petitioner's total bank balance was $11,479.98 before the issuance *274 of checks numbered 3282 and 3283. On March 2, 1949, petitioner borrowed from the Mutual Bank and Trust Company the sum of $36,000, and on March 29, 1949, repaid the bank said loan of $36,000. On March 1, 1949, petitioner, by its duly authorized officers, executed ten negotiable promissory notes dated March 1, 1949, payable ten years after date to the order of petitioner, each in the face amount of $5,910, with interest from February 28, 1959, at the rate of 8% per annum. Petitioner, by its duly authorized officers, endorsed said ten promissory notes and negotiated and delivered the same on March 2, 1949, to Charles E. Potter and Co., a nominee partnership of the trustees of the Charles E. Potter Trusts, who thereupon delivered a check for $30,040.50 to petitioner. The trustees' bank balance before the issuance of this check was $9,877.30. The foregoing ten promissory notes dated March 1, 1949, were paid at their discounted value on the following dates and in the following amounts: Payment
Pro-
Face of
Discount
Voucher
Amount of
Amortized
ceeds of
of
Date
Note
Note
Face Amt.
Number
Check
Discount
Loan
Nos.
3- 1-50
1
$ 5,910
$ 2,665.63
4873
$ 3,244.37
$ 240.32
$ 3,004.05
6- 1-54
2-3-4
17,730
4,868.43
12476
12,861.57
3,849.42
9,012.15
11-30-54
5-6
11,820
2,950.64
13392
8,869.36
2,861.26
6,008.10
1-27-55
7-8-9-10
23,640
5,704.64
13703
17,935.36
5,919.16
12,016.20
$59,100
$16,189.34
$42,910.66
$12,870.16
$30,040.50
*275 Following Charles E. Potter's death, petitioner's board of directors held a special meeting on October 22, 1948, at which various resignations were tendered and accepted, and the vacancies in office created by such resignations and by the death of Charles E. Potter were filled by action of the board, after which the board of directors consisted of the following: W. T. McCane, (Ida L. Potter's son-in-law), B. N. Rosene, and M. E. Turner. Officers of the petitioner were as follows: president - W. T. McCane; vice president - B. N. Rosene; vice president - James W. Flotron, Jr.; treasurer - Ida L. Potter; secretary - M. E. Turner. At the adjourned special meeting of petitioner's stockholders held February 2, 1949, the following named persons were elected members of petitioner's board of directors: W. T. McCane, B. N. Rosene, James W. Flotron, Jr., G. W. Schlueter, Alexander M. Meyer, Ida L. Potter, and M. E. Turner. At the meeting of petitioner's board of directors held on the same day the following named directors were elected to the following offices: W. T. McCane
President
B. N. Rosene
Vice President
James W. Flotron, Jr.
Vice President
G. W. Schlueter
Vice President
M. E. Turner
Secretary
Ida L. Potter
Treasurer
*276 The above named officers and directors remained as petitioner's officers and directors until January 9, 1950. The amounts accrued by petitioner to the Charles E. Potter Trust as rent during the years 1950, 1951, and 1952, were not reasonable and were not required to be paid as a condition to the continued use and possession of the property at 1211-1213 Pine Street to the extent that such amounts exceeded $10,200, plus insurance, taxes, and upkeep in the amounts of $2,970.94, $3,034.78, and $2,693.71, respectively, in the years 1950, 1951, and 1952. As a consequence of the issuance of petitioner's promissory notes in March 1949 there was established between the petitioner and the trust the relationship of debtor-creditor. Opinion The first question for our determination is whether petitioner is entitled to deduct amounts in excess of $10,470.94, $10,534.78, and $10,193.71, respectively, for the years 1950, 1951, and 1952, for the continued use and possession of the property at 1211-1213 Pine Street, in St. Louis, Mo.
Petitioner claimed deductions with respect to such property in the total amounts of $16,275.09 for 1950, $23,696.52 for 1951, and $28,849.26 for 1952, based *277 upon a basic rental of $10,200 per year and 15% of the annual net profits, plus real estate taxes, building repairs, and insurance. Respondent determined that petitioner was "required to pay $7,500 per year in rent," plus taxes, repairs, and insurance in the amounts of $2,970.94, $3,034.78, and $2,693.71, respectively, for the years in issue. The amounts claimed by petitioner and allowed by respondent for taxes, repairs, and insurance were the same. Accordingly, the effect of respondent's determination was to disallow $2,700 of the basic rental claimed by petitioner for each of the years in issue, and all of the amounts claimed by petitioner under the percentage provision of the lease, being $3,104.15 for 1950, $10,461.74 for 1951, and $15,955.55 for 1952. Section 23(a)(1)(A) of the Internal Revenue Code of 1939 provides for the deduction of all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property * * *." As may be noted, the Code does not specifically limit deductions *278 for rental payments to "a reasonable allowance" as in the case of salary or compensation. Stanley Imerman, 7 T.C. 1030. The primary consideration as to the deductibility of payments claimed as rental expenses is whether they were in fact rental payments. To the extent they were not, such payments would not be ordinary and necessary and therefore would not be deductible as rental expenses. Southern Ford Tractor Corp., 29 T.C. 833. In Roland P. Place, 17 T.C. 199, 203, affd. 199 F. 2d 373, certiorari denied, 344 U.S. 927, the general rule was stated to be as follows: "The basic question is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. The inquiry is whether the petitioner was in fact and at law 'required' to pay these sums as rent. See section 23(a)(1)(A) of the Internal Revenue Code. When there is a close relationship between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary *279 to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. Manos v. Commissioner, 187 F. 2d 734; Stanwick's Inc., 15 T.C. 556, affd. (C.A. 4), June 25, 1951; Limerick's Inc., 7 T.C. 1129, affd. 165 F. 2d 483; Hightower v. Commissioner, 187 F. 2d 535. See Commissioner v. Lincoln Electric Co., 176 F. 2d 815." See also Herbert Davis, 26 T.C. 49. As the evidence clearly indicates, there was a close relationship between the lessor and the lessee at the time the lease involved herein was entered into. The Charles E. Potter Trust owned all the outstanding common stock of petitioner and 300 of the 365 shares of its outstanding preferred stock. The trustees at that time were M. E. Turner, The Guaranty Trust Company of Missouri, and Ida L. Potter. In addition to being an individual trustee, Turner was also a director of The Guaranty Trust Company, one of the other trustees. At the same time Turner was also a director and secretary of petitioner. As one of the three trustees, Turner signed the lease on behalf of the *280 trust; as one of the three directors of petitioner he also considered and approved the lease on behalf of petitioner. It is also to be noted that W. T. McCane, who signed the lease on behalf of petitioner, as its president, and was one of its three directors, was a son-in-law of Ida L. Potter, who was also one of the three trustees of the Charles E. Potter Trust and a beneficiary thereof, as well as an officer of petitioner. McCane's wife was also a beneficiary of the trust; conditioned upon her mother's failure to exercise her power of appointment, Margaret B. McCane would receive the net income from one-half the first trust. Although there is testimony that Ida L. Potter may have opposed the purchase of the Pine Street property by the trust, there is no evidence as to the reasons for such opposition or that she opposed the leasing of the property to petitioner. That petitioner had legitimate business reasons for leasing the Pine Street property may be conceded. In the light of the close relationship which existed between petitioner and the Charles E. Potter Trust, however, we can find no support for the contention that the lease was entered into in an arm's length transaction. *281 On the contrary, considering all the circumstances, we are convinced the lease was not the result of arm's length negotiations and so hold. This brings us to consideration of the reasonableness of the amounts paid or accrued as rent for the Pine Street property during the years in issue and whether such amounts are in excess of what petitioner would have been required to pay had it dealt at arm's length with a stranger. In support of its contention that the rental deductions claimed by it are reasonable, petitioner points to the special needs of its business, such as a central location, the availability of telephone conduits, the need for manufacturing space and the availability of parking space for its service cars or trucks, also to the particular suitability of the Pine Street property for such needs. It also points to the amount of rent it had been required to pay for approximately half as much space in the Century Building. These are unquestionably proper factors to be taken into consideration in determining what would constitute a reasonable rental for the property involved. Certainly any lessee would want to consider its needs and the suitability of the particular property *282 for such needs before deciding to lease the property at all. There are other factors, however, which should be considered, particularly where, as here, there is a close relationship between the lessor and the lessee and an absence of arm's length dealing. The prior rental history of the Pine Street property is of particular importance. Prior to the purchase of the building by the Charles E. Potter Trust, the previous tenants had paid a total of $4,800 per year; only one of the occupants was required to pay taxes thereon; and neither made any improvements. Contrasted with this is the initial basic rental of $10,200 a year which petitioner contracted to pay, to be periodically increased to a maximum of $24,000 per year during the last five years of the 20-year lease. In addition, petitioner was obligated to pay the lessor 15% of its net profits, as well as to pay all taxes, repairs, and insurance, and to make all improvements at its own expense. During the years in issue, taxes, repairs, and insurance amounted to $2,970.94 in 1950, $3,034.78 in 1951, and $2,693.71 in 1952; fifteen percent of net profits amounted to $3,104.15 in 1950, $10,461.74 in 1951, and $15,955.55 in 1952. Improvements *283 made by petitioner totaled $44,807.09 by the end of 1952. Another important factor to be considered is the purchase price, $75,000, which the lessor paid for the property immediately preceding and in contemplation of its leasing to the petitioner. The basic rental agreed upon alone would pay off the entire purchase price of $75,000 in seven years. And if the percentage of net profits is added, the entire $75,000 purchase price would be paid off in less than four years. The only witness, experienced in the rental of business property in St. Louis offered by either party, testified that most owners of business property would be satisfied with a rental return equivalent to 10% of the cost of the property. Petitioner would have us compare the amount, $8,229, paid for space in the Century Building and for warehouse space in 1948, with the amounts paid or accrued for the use or possession of the Pine Street Building. The space occupied in the Century Building was 5,265 square feet, but the amount of the warehouse space is not shown. The space available to petitioner in the Pine Street building, including warehouse usage, was 11,297 square feet. The principal difficulty with such comparison *284 is that petitioner has not shown the two buildings to be comparable for rental purposes. The Century Building is located in what appears to be a highly concentrated commercial and shopping area, including large department stores and public office buildings, whereas the Pine Street building, though located but a few blocks away, appears to be outside of the strictly commercial area. Manufacturing activities were prohibited in the Century Building but were permissible in the Pine Street building. Petitioner has not offered the testimony of any competent and disinterested witness as to the reasonable rental value of the Pine Street property, or of comparable properties, similarly used and in the same general area. Considering the record as a whole, we are unable to conclude that the rentals paid or accrued by petitioner for the use or possession of the Pine Street property during the years involved are reasonable or are what would have been required had petitioner been dealing at arm's length with a stranger. On the other hand, we do not agree that the rentals determined by respondent are what would have been required had petitioner been dealing at arm's length with a stranger. Ten *285 percent of the purchase price paid for the Pine Street property by the Charles E. Potter Trust is not considered a proper measure of the rental value of the property involved in the instant case. The property was originally purchased by the Essex Investment Company in 1930 for $200,479.50. The Essex Investment Company was a "family corporation" owned by the Bixby family. It was apparently in the process of liquidation in 1948 and under pressure by the Bureau of Internal Revenue to liquidate more rapidly. The ten year lease of the principal occupant expired in November 1948 and it moved out. The owners were unwilling to enter into another long-term lease because of the insistence that they liquidate more rapidly and they did not want to incur additional expenses for insurance, taxes, and unkeep. Under the circumstances the $75,000 paid for the Pine Street property by the Charles E. Potter Trust does not appear to be truly representative of the fair market value at the time of the sale. Consequently the $7,500 in basic rental determined by respondent is not considered adequate. Considering all the facts and circumstances, we have concluded that $10,200 represents a reasonable rental *286 for such property during each of the years involved and that all payments in excess of $10,200 per year, plus insurance, taxes, and repairs in the amounts of $2,970.94, $3,034.78, and $2,693.71, respectively, for the years 1950, 1951, and 1952, were not required to be paid by petitioner as a condition to the continued use and possession of such property. To the extent payments are in excess of such amounts they are disallowed. Cf. Limericks, Inc., 7 T.C. 1129, affd. 165 F. 2d 483. The facts pertinent to the second issue are, in brief, as follows. Petitioner borrowed $36,000 from the Mutual Bank and Trust Company. At the same time it redeemed the 300 shares of preferred stock held by the trust (which also held all its common stock) for $30,350, and the remaining shares of preferred stock which were held by Mrs. Potter for $6,070. Then petitioner executed ten promissory notes, payable ten years after date, each in the face amount of $5,910, with interest from date of maturity at the rate of 8% per annum, and endorsed and delivered said notes to the trust, whereupon the trust delivered a check for $30,040.50 to petitioner corporation. Within the same month *287 the petitioner repaid its bank loan. Within six years, long prior to maturity, petitioner fully repaid the promissory notes at their discounted values as set forth in our findings. Petitioner contends that when these notes were negotiated at a discount a debtor-creditor relationship was created; that the amortization of discount on notes claimed by petitioner was in fact interest and was actually paid; and that petitioner, as an accrual basis taxpayer, is entitled to an amortization of discount deduction under the provisions of section 23(b) which provides for the deduction of "All interest paid or accrued within the taxable year on indebtedness * * *." Respondent maintains that no real indebtedness arose from the transactions in issue and cites as authority for his position the cases of Talbot Mills v. Commissioner, 326 U.S. 521; Gregory v. Helvering, 293 U.S. 465; and Gooding Amusement Co., 23 T.C. 408, affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031. Whether or not the transactions in issue resulted in the creation of a debtor-creditor relationship between the petitioner corporation and the *288 trust is a question of fact. In resolving such question none of the criteria usually invoked in ascertaining whether a particular instrument represents a true indebtedness is, of itself, determinative. Nor does the satisfaction of the formal criteria of indebtedness control our determination, for our inquiry is not limited to the instruments themselves, but extends to "all the surrounding circumstances to determine whether the real intention of the parties is consistent with the purport of the instruments." Gooding Amusement Co., supra, at 418. Although the substantial identity of interest between the creditor and debtor invites our close scrutiny, it does not preclude a valid debt instrument nor the consequent interest deduction, if it is accompanied by the formal criteria and the proper conforming intent. Assuming the notes are true instruments of indebtedness, there is little question that the discount difference is the equivalent of deferred interest which may be amortized and deducted for the year in which accrued. In our opinion, the transactions in question resulted in a debtor-creditor relationship between petitioner corporation and the trust. The notes were *289 issued at maturity values totaling $59,100 in exchange for $30,040.50. The discount difference represents the equivalent of 7% interest compounded annually over the notes' ten-year lifetime. The notes have the indicia of real debt instruments. They were assignable, negotiable, both principal and interest were due at a fixed maturity date in the reasonable future, and they were not subordinated to any other liabilities. Furthermore, the surrounding circumstances indicate that the real intention of the parties is consistent with the purport of the notes. That the petitioner intended them as true debt instruments is corroborated by the fact that petitioner honored them long before maturity and paid the proportionate part of the interest or discount due. None of the cases cited by respondent are here controlling. The instant notes more closely resemble the debentures in John Kelley Co., 326 U.S. 521, which were held true instruments of indebtedness, than the notes in its companion case, Talbot Mills v. Commissioner, supra, where the interest deduction was denied. The facts here are distinguishable from those in Gooding Amusement Co., supra, on *290 which respondent places so much reliance. In that case the notes were subordinated to claims of other creditors, the question of "thin incorporation" was involved, the Court found that enforcement of the notes was never intended and, in fact, the majority of the notes were not paid at maturity. And finally, even though tax minimization may have been a consideration, the record indicates that the note transaction was of substance, possessed economic reality, and accordingly does not come within the prohibition of Gregory v. Helvering, supra. Accordingly, we hold respondent erred in disallowing petitioner's interest deductions for the years 1950, 1951, and 1952, with respect to the notes in issue. Decision will be entered under Rule 50. Footnotes
*. Accrued 12-31-47 The date "12-31-57" was changed to "12-31-47" by an official order of the Tax Court, dated February 29, 1960 and signed by Judge Bruce.
**↩