SOUTHERN FORD TRACTOR CORPORATION, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 60547–60550.   Filed February 12, 1958.

---

[1] The following proceedings are consolidated herewith: Louis H. Clay and Stuart Sanderson Clay, Husband and Wife, Docket No. 60548; Estate of Mary Creveling Dutton, deceased, and Tom W. Dutton, Surviving Husband, Docket No. 60549; and Tom W. Dutton and Constance Dutton, Husband and Wife, Docket No. 60550.

*Robert Ash, Esq.,* and *Carl F. Bauersfeld, Esq.,* for the petitioners.
*John P. Higgins, Esq.,* for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in income taxes of the petitioners as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Southern Ford Tractor Corporation | 60547 | [1] 1951 | $3, 087. 00 |
| | | 1952 | 6, 979. 34 |
| | | 1953 | 43, 146. 69 |
| Louis H. Clay and Stuart Sanderson Clay, husband and wife | 60548 | 1952 | 42, 602. 76 |
| | | 1953 | 17, 383. 60 |
| Estate of Mary Creveling Dutton, deceased, and Tom W. Dutton, surviving husband | 60549 | 1952 | 42, 636. 48 |
| Tom W. Dutton and Constance Dutton | 60550 | 1953 | 10, 389. 16 |

[1] Taxable years of corporate petitioner are fiscal years ending September 30.

The issues raised by the pleadings in these consolidated cases are (1) whether the individual petitioners realized distributions in the nature of dividends in 1952 or 1953 from the corporate petitioner; (2) whether the rentals accrued by the corporate petitioner on the property rented from Farm Industries, Inc., were in part, or in total, ordinary and necessary business expenses in the years before us; (3) whether the expenditure in fiscal 1951 by the corporate petitioner for filling in and grading real estate owned by the corporate petitioner was a capital expenditure or an ordinary and necessary business expense; and (4) whether the expenditures of the corporate petitioner in the taxable year ended September 30, 1953, incident to the installation of a fire-warning system was in the nature of a capital expenditure or an ordinary and necessary business expense. Because of concessions by both parties, a recomputation under Rule 50 will be necessary.

FINDINGS OF FACT.

Some of the facts were stipulated by the parties and are found accordingly.

Petitioner Southern Ford Tractor Corporation, hereinafter referred to as Southern Ford, is a Louisiana corporation with its principal address at 616 Jefferson Highway (formerly 900 Jefferson Highway),

New Orleans, Louisiana. Southern Ford kept its books on an accrual basis of accounting and filed its income tax return for the fiscal year ending September 30, 1951, with the then collector of internal revenue for the district of Louisiana, and its income tax returns for the fiscal years ending September 30, 1952 and 1953, with the district director of internal revenue for the same district.

Louis H. Clay and Stuart Sanderson Clay, petitioners in Docket No. 60548, are husband and wife, residing in New Orleans, Louisiana. They timely filed joint returns with the district director of internal revenue at New Orleans, Louisiana, for 1952 and 1953.

The Estate of Mary Creveling Dutton, deceased, and Tom W. Dutton, petitioners in Docket No. 60549, timely filed their joint income tax return for 1952 with the district director of internal revenue at New Orleans, Louisiana. Mary Creveling Dutton, wife of Tom W. Dutton, died May 14, 1952.

Tom W. Dutton and Constance Dutton, petitioners in Docket No. 60550, are husband and wife residing in New Orleans, Louisiana. They timely filed a joint income tax return for 1953 with the district director of internal revenue at New Orleans, Louisiana. They were married on August 25, 1953.

Southern Ford, during the years before us, was a distributor for Dearborn Motors Corporation, hereinafter referred to as Dearborn, of Ford tractors, implements, and related products to dealers in the State of Louisiana, about two-thirds of Mississippi, and 9 counties in Alabama. The outstanding capital stock of Southern Ford prior to the death of Mary Creveling Dutton was held as follows:

|  | Shares |
|---|---|
| Louis H. Clay, Sr | 499 |
| Mrs. Stuart S. Clay (wife of Louis H. Clay, Sr,) | 1 |
| Tom W. Dutton | 500 |

After the death of Mary Creveling Dutton, 125 shares of the stock held by Tom W. Dutton were acquired by his minor children, Mary Eleanor Dutton and Tom W. Dutton, Jr., through the medium of their deceased mother's interest in community property.

The following schedule indicates the facilities owned by Southern Ford on Jefferson Highway and Lake Avenue prior to August 1, 1952:

| Facility | Date acquired | Cost | Depreciation | Book value Aug. 1, 1952 |
|---|---|---|---|---|
| Land on Lake Ave., 1.12 acres | 1948 | $2,360.00 | | $2,360.00 |
| Land on Lake Ave., 1 acre | 1948 | 2,000.00 | | 2,000.00 |
| Office and warehouse, 616 Jefferson Hwy., 75' x 209' | 1948 | 47,636.29 | $10,719.92 | 36,918.37 |
| Open warehouse steel and asbestone, 60' x 180' | May  1, 1952 | 15,500.00 | 388.28 | 15,111.72 |
| | | | | 56,390.09 |

These facilities were used by Southern Ford both as sales offices and warehouse space.

Beginning in about 1949, Dearborn notified Southern Ford by letter of a planned expansion program. This was followed up by personal representatives' urging Southern Ford to expand its facilities. It was determined that Southern Ford had inadequate storage, demonstration, and training facilities. It was therefore determined that Southern Ford needed additional space or land for these purposes.

A part of the planned expansion was to increase the Ford line of tractors from 1 model to 12 and to market 120 implements. This required additional capital on the part of the distributors in order to carry a proper inventory of the larger line of equipment. This is demonstrated by the fact that Southern Ford's inventory increased from a low of approximately $280,000 in September 1948 to a high of approximately $1,000,000 in September 1952. Some of the new line of equipment to be distributed required special equipment for maintenance and special facilities for storage.

Prior to August 1, 1952, Southern Ford had been renting 18,000 square feet of warehouse space at what was formerly Camp Plauche, a temporary Army depot, located at Harahan, Louisiana. This facility burned down leaving Southern Ford without adequate warehouse space.

Southern Ford located a suitable tract of property consisting of approximately 50 acres at Harahan, Louisiana, and determined to acquire it. This property will be referred to as the Harahan property. When it became known to Southern Ford's banker that it was contemplating purchasing and developing the Harahan property, Southern Ford was advised that it would be easier to finance the purchase and development of the property if another corporation took title to the real estate and Southern Ford could then lease it. It was then determined that the suggestion would be carried out, permitting Southern Ford to acquire the use of the property without having to tie up its needed capital in real estate and development. It was also decided that Southern Ford would sell the real estate previously held by it to the new corporation and also lease it back.

Pursuant to the plan, Farm Industries, Inc., hereinafter referred to as Farm Industries, was organized on July 25, 1952, for the purpose of owning and renting real estate. The outstanding capital stock in 1952 and 1953 was held as follows:

| | Shares |
|---|---|
| Louis H. Clay, Jr. (son of Louis H. Clay) | 50 |
| Tom W. Dutton, Jr., Trust (son of Tom W. Dutton) | 25 |
| Mary Eleanor Dutton Trust (daughter of Tom W. Dutton) | 25 |
| Total | 100 |

The initial capitalization of Farm Industries was $10,000, of which Louis H. Clay, Jr., invested $5,000 from his own separate funds.

As of August 1, 1952, Farm Industries purchased the property owned by Southern Ford at Jefferson Highway and Lake Avenue for a consideration of $70,500. Southern Ford reported a gain on this sale of $14,109.91. The sales price for this property was arrived at by the officers of Southern Ford after investigating the cost of purchasing like property and constructing like buildings thereon.

As of August 1, 1952, Farm Industries purchased 32.63 acres of the Harahan property from the Illinois Central Railroad for a consideration of $81,575. Also as of August 1, 1952, Farm Industries leased, with an option to purchase, 17.37 acres of the Harahan property. The option was exercised for $43,425 on June 2, 1953.

Farm Industries financed its purchases of the above properties by borrowing from the National Bank of Commerce at New Orleans. The maximum amount borrowed at any time from the bank was $215,000. Mortgages on the purchased properties and assignment of the lease were given to secure the obligation.

On August 1, 1952, Southern Ford leased from Farm Industries all of the properties purchased by Farm Industries. The lease first provided for a minimum yearly rental of $21,600. The lease further provided that the lessee should pay an additional amount of rental for each lease year in the amount of which 1½ per cent of the net sales of the lessee exceeded the minimum rental. The lease also provided that the lessor agreed to spend not less than $50,000 on improvements in building a warehouse and track facilities at Harahan according to the specifications of the lessee. The term of the lease was 10 years with an option for a 5-year extension.

Immediately after the lease was entered into, Southern Ford began to use the Harahan property for demonstration purposes. Farm Industries began constructing the buildings specified in the lease in 1952 and substantially finished them in 1953. These buildings included an implement shed, a warehouse containing an auditorium and training facilities and were completed at a cost of $112,433.77.

The percentage of sales used by Southern Ford was determined after investigating rates charged distributors in similar businesses. Sales of Southern Ford for the 5 years preceding 1952 indicated that the rental, based upon 1½ per cent of such sales, would total approximately $50,000 per year. The farm implement business is a highly seasonal and fluctuating business. The purpose of a percentage lease was to have rental costs fluctuate with good and lean years proportionate to those fluctuations.

Southern Ford accrued on its books the following rental payments to Farm Industries in the fiscal years ending September 30, 1952 through 1956:

| | 1952 | 1953 | 1954 | 1955 | 1956 |
|---|---|---|---|---|---|
| October | | $12,840.43 | $5,802.42 | $3,701.43 | $6,534.76 |
| November | | 6,803.82 | 1,835.94 | 5,205.15 | 4,558.57 |
| December | | 3,015.85 | 1,671.64 | 2,589.72 | 5,844.99 |
| January | | 5,471.61 | 3,416.79 | 4,563.76 | 4,566.49 |
| February | | 7,551.34 | 3,790.67 | 5,643.68 | 5,700.07 |
| March | | 9,231.68 | 7,931.31 | 9,065.85 | 6,657.94 |
| April | | 7,996.72 | 6,862.13 | 6,034.95 | 6,002.14 |
| May | | 7,008.82 | 5,902.73 | 6,529.63 | 6,075.66 |
| June | | 5,429.27 | 4,912.92 | 5,665.06 | 4,911.65 |
| July | | 5,336.87 | 3,083.10 | 5,235.48 | 5,535.56 |
| August | $8,779.62 | 3,357.21 | 3,668.55 | 6,014.60 | 5,452.39 |
| September | 3,806.70 | 4,870.14 | 4,491.97 | 5,582.91 | 7,180.47 |
| Total | 12,586.32 | 78,913.76 | 53,370.17 | 65,832.22 | 69,020.69 |

The respondent disallowed the deduction of $12,586.32 for rentals paid in fiscal 1952 to the extent of $9,179.24. The notice of deficiency provided that $3,407.08 represented the amount which was determined to be the fair rental charge for August and September 1952. Similarly, the respondent disallowed the deduction of $78,913.76 to the extent of $58,471.23, determining that the difference was the fair rental charge for the fiscal year 1953.

The respondent also determined, in statutory notices to Louis H. Clay and Stuart Sanderson Clay, that they received taxable distributions for Southern Ford in the amounts of $51,897.86 and $22,560.57 in 1952 and 1953, respectively. Similarly, it was determined that the Estate of Mary Creveling Dutton, deceased, and Tom W. Dutton, surviving husband, received taxable distributions from Southern Ford in the amount of $51,897.86 in 1952. Similarly, it was determined that Tom W. Dutton and Constance Dutton received taxable distributions from the same source in the amount of $20,625.76 in 1953. Each petitioner denied receiving any such distributions in any of the years in question.

The property used by Southern Ford at 900 Jefferson Highway consisted of a parcel of 2.12 acres of land. The parcel was divided by a railroad track into a 1-acre lot and a 1.12-acre lot. Southern Ford's buildings were on the west side of the tracks, or the 1.12-acre lot. The 1-acre lot on the east side of the tract was vacant and unused.

The vacant lot had been drained by a drainage ditch but a plumbing supply contractor built a building to the rear of the vacant lot, cutting off the natural drainage of the lot. As a result, water puddled and seeped under the railroad track into Southern Ford's building and storage space. Southern Ford expended $3,450 to fill in and level the 1-acre vacant lot during the taxable year ended September 30, 1951. This expenditure was deducted by Southern Ford as repairs. The respondent determined that the expenditure was a nondeductible capital expenditure.

In fiscal 1953, Southern Ford had American District Telegraph Company, hereinafter referred to as A. D. T., install electronic sig-

naling devices on the sprinkler system already installed in the building it was leasing from Farm Industries. These signaling devices notified a central station of the installing company of any appreciable lowering of water pressure in the sprinkler system which would indicate a leak or fire in the plant. The installing company then would notify the fire department and a designated representative of Southern Ford.

The contract under which the system was installed and was to be maintained provided in part that Southern Ford would pay $756 upon completion of installation, and pay, in addition, the sum of $613.80 per annum in advance for a period of 5 years for continuing services rendered under the contract. In fiscal 1953 Southern Ford paid $816.48 to the installing company for which a deduction was taken as an ordinary and necessary business expense. The respondent determined that the expenditure was capital in nature and allowed it to be amortized over the life of the term of Southern Ford's lease with Farm Industries.

The land and building at 616 Jefferson Highway which was sold to Farm Industries by Southern Ford had a fair market value not in excess of $70,500.

The sums paid by Southern Ford to Farm Industries were required to be paid under the lease as a condition to the continued use of the property. The amounts accrued are deductible in full as rental expenses.

The individual petitioners received no distributions in the nature of dividends in the years before us as a result of the sale and lease transaction.

The expenditure of Southern Ford in fiscal 1951 for filling in and grading real property at 616 Jefferson Highway was properly deducted as a repair expense.

The expenditure of the corporate petitioner in fiscal 1953 for installing a fire-warning system in the building used by it was capital in nature and nondeductible as an ordinary and necessary expense.

### OPINION.

Respondent makes some mention in his brief that the entire sale and leaseback arrangement served no business purpose. We think that Southern Ford had legitimate business reasons for disposing of its real property and thereafter leasing it and other property from Farm Industries. In fact, Southern Ford's banker and financial adviser testified that he advised doing just that for financially adequate reasons.

Southern Ford's business required many and continuing financial commitments. Among other things, it made many short-term loans; it had agreements whereby it was contingently liable as guarantor

for new tractors and equipment which were financed by Dearborn Motors Credit Corporation; and was coguarantor on used tractors and equipment sold by its dealers and financed by Dearborn Motors Credit Corporation. Because of these commitments, Southern Ford's banker thought it advisable, from a financial standpoint, to have a separate corporation own and finance the contemplated development of real estate. In addition to this, Dearborn suggested that by selling its real estate and leasing the property needed, Southern Ford would have more liquid assets for the operating capital expected to be needed.

The first real issue raised by the pleadings is whether the individual petitioners realized distributions in the nature of dividends from the corporate petitioner in 1952 and 1953. The statutory notices to the individual petitioners merely stated that "[i]t has been determined that you received taxable distributions from the Southern Ford Tractor Corporation in the amount of [varying amounts to each individual petitioner] which you failed to report on your return." This was denied by each individual petitioner.

The theories upon which respondent made the determination are found in the opening statement to the Court by counsel for the respondent, as follows:

In 1952 and '53 the Respondent has determined that the excess of the fair market value of the property sold by the corporation to the corporation owned by the children over the actual value, I mean over the price set in the contract, constitutes a dividend for the benefit of the stockholders and is taxable to them.

The Respondent also contends that the excess of the rental paid over that amount determined reasonable is for the benefit of the stockholders and is taxable to them on a pro rata basis.

We therefore see that the issue of whether the individual petitioners received taxable distributions from the corporate petitioner depends in part upon our determination of the second issue, that is, whether the rentals accrued by the corporate petitioner on the property rented from Farm Industries were ordinary and necessary business expenses. We will first consider the contention of the respondent as to whether a "bargain sale" was effected as between Southern Ford and Farm Industries, and the effect thereof.

Section 115 (a)[2] defines dividends as "any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits * * *." It is of no importance that the transfer assumed the form of a sale and that there was no express declaration of a dividend. *Timberlake* v. *Commissioner*, 132 F. 2d 259, affirming 46 B. T. A. 1082. A bargain sale to a stockholder by a corporation may result in a dividend to the stockholder to the extent of the bargain, or in other words, to the extent that the market value

---

[2] All references to section numbers are to the Internal Revenue Code of 1939 unless otherwise provided.

of the property transferred exceeds the consideration paid therefor. *Palmer* v. *Commissioner*, 302 U. S. 63.

Determining a market value for the property transferred is an essential element in determining whether a bargain sale was effected for the benefit of its stockholders. The petitioners contend, and put into the record evidence tending to show, that the property had a market value not in excess of $70,500, which was the price paid for the property by Farm Industries. On brief, the respondent asks us to find that the market value of such property was $147,567, contending that "[i]t has been established that the fair market value of the property sold exceeded the selling price by at least $77,067.00." The respondent neglected to tell us the manner in which this figure was derived. No valuation of any kind was determined in the statutory notices.

Indeed the deficiency notices "that you received taxable distributions" would not indicate any determination that a bargain sale was effected, and much less any figure of fair market value to which could be accorded the presumption of correctness that respondent ordinarily receives. Respondent introduced no evidence at the hearing. As said in *Palmer* v. *Commissioner*, *supra*, "the bare fact that a transaction, on its face a sale, has resulted in a distribution of some of the corporate assets to stockholders, gives rise to no inference that the distribution is a dividend * * *." We realize the presumption of correctness of the respondent's determination applies not only to the actual determination but also to all findings which are necessarily included in the determination. *J. M. Perry & Co.* v. *Commissioner*, 120 F. 2d 123. But when it is not readily apparent that some intermediate finding was made as a step in the ultimate determination of deficiency, the Commissioner owes some duty to state it in his "Explanation of Adjustments" accompanying the deficiency notice or otherwise disclose it.

The petitioners' witnesses testified that the sales price was set after determining that similar land could be purchased and similar buildings could be constructed for the same price for which the property was sold. It was further shown that this property was sold to Farm Industries at a reported gain of approximately $14,000 over its book value after Southern Ford had retained the property only 4 years. Since there is nothing told us in the record of any other value to be placed on the property, we think that petitioners' evidence sufficiently shows that the fair market value of the property involved did not exceed $70,500, and we so hold.

Since we have determined that Southern Ford sold its property to Farm Industries for not less than its fair market value, it follows that the individual petitioners could not have received a taxable distribution as a result of the sale. For a sale transaction to be considered a taxable distribution, the transaction must, in purpose or effect, be

used as an implement for the distribution of corporate earnings. *Palmer* v. *Commissioner, supra.* Neither the purpose nor the effect is present when property is sold by a corporation to its stockholders for its fair market value as the net worth of the corporation is not diminished by such a transaction.

The second issue also involves or affects both the corporate and the individual petitioners. The respondent disallowed rentals accrued in fiscal 1952 and 1953 by Southern Ford to Farm Industries to the extent that such rentals exceeded a determined reasonable rental. Respondent contends that the excess of the rentals accrued over such reasonable rentals somehow filtered back to the stockholders of Southern Ford as informal taxable dividends. The petitioners, on the other hand, contend that the entire accrual represented rent, and the entire amount is deductible as ordinary and necessary business expense.

Section 23 (a) (1) (A) provides for the deduction of all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any ·trade or business, including, "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property * * *." As can be noted, the Code does not strictly limit deductions for rental payments to "a reasonable allowance" as in the case of salary or compensation. *Stanley Imerman,* 7 T. C. 1030.

The primary consideration as to deductibility of rent seems to be whether the payments were in fact rental payments. To the extent that they were not, such payments would not be ordinary and necessary and therefore not deductible as a rental expense. We stated the general rule in *Roland P. Place,* 17 T. C. 199, 203, affd. 199 F. 2d 373, certiorari denied, 344 U. S. 927, as follows:

> The basic question is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. The inquiry is whether the petitioner was in fact and at law "required" to pay these sums as rent. See section 23 (a) (1) (A) of the Internal Revenue Code. When there is a close relationship between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. [Citations omitted.]

Whether or not the payments accrued by Southern Ford to Farm Industries constituted rental payments is a question of fact. *Utter-McKinley Mortuaries* v. *Commissioner,* 225 F. 2d 870, affirming a Memorandum Opinion of this Court dated July 7, 1953. The respondent contends that the rental agreement was not an arm's-length transaction; that Southern Ford stockholders controlled Farm Industries and entered into the whole transaction as an attempt to siphon

earnings to Farm Industries at the instigation and for the benefit of the stockholders of Southern Ford.

This is not a case of a corporation dealing directly with its stockholders as are the cases cited by the respondent. Here we have a corporation selling property and leasing that property and other property from another corporation. It is true that the stock of Farm Industries was held personally by, or was held in trust for, children of the stockholders of Southern Ford, but this does not necessarily mean that Farm Industries is controlled by the stockholders of Southern Ford, as contended by respondent.

As to the "reasonableness" of the rent, our only evidence is that of the petitioners. The practice of fixing rentals for commercial properties on a percentage of sales basis instead of a flat rate basis is a recognized and accepted basis. Such an arrangement is particularly adaptable to a business which is prone to fluctuate more than usual. "That the amount of rent rises and falls with the trend of the business and is greater in the year or years when business is best is an accepted characteristic of a percentage lease." *Stanley Imerman, supra.*

There was testimony that the farm implement business was a highly unstable business, fluctuating with farm business. Certainly we cannot say that the type of lease entered into was improper, as respondent would have us hold. There was testimony that the rental agreed upon was determined after "a very thorough investigation on the part of Southern Ford as to rentals charged by distributors in business similar to ours." Assuming, *arguendo,* that the present lease was not entered into in an arm's-length transaction, it would seem that a rate of rental determined in this fashion would not be excessive over that which would be required to be paid if dealing at arm's length. The witness further testified that the past sales of Southern Ford were studied to determine the percentage of sales to be used as rental. This was the only direct evidence as to the reasonableness of the rentals accrued. This evidence was neither contradicted nor questioned on cross-examination by the respondent.

On the basis of the record before us, we cannot conclude that the rentals accrued pursuant to the terms of the lease entered into on August 1, 1952, were intended to be anything other than rentals required to be paid for the continued use and possession of property. As such, the accruals are fully deductible to the corporate petitioner as rental and therefore cannot be considered as informal dividends to the stockholders of Southern Ford.

Our third issue deals with an expenditure of the corporate petitioner in fiscal 1951. The petitioner filled in and graded a portion of its property at 616 Jefferson Highway at a cost of $3,450, which was deducted as a repair expense in fiscal 1951. The respondent disallowed

the deduction, determining that the expenditure was in the nature of a capital expenditure and not deductible under the provisions of section 24 (a) (2) and (3).[3]

Whether an expenditure on a piece of property is a repair expense or should be capitalized is a problem which is often difficult to resolve. Several tests, or general rules, are suggested in *Illinois Merchants Trust Co., Executor*, 4 B. T. A. 103, 106, an early leading case, as follows:

In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. * * *

The physical layout of the corporate petitioner's property at 616 Jefferson Highway is described in our Findings of Fact. The 2.12-acre tract is divided into 2 lots by a railroad track. Petitioner's buildings are located on the slightly larger lot which is 1.12 acres. The expenditure in question was for filling in and grading the smaller lot.

Petitioners here contend, and the evidence tends to show, that the property on which the sum in question was expended was originally drained by a ditch and that such drainage was of sufficient efficiency that water did not seep into the corporate petitioner's storage and operating facilities. This condition was changed when a business building was constructed to the rear of the lot in question, as the drainage ditch was blocked. The lot did not properly drain, and water puddled and seeped under the railroad bed into the corporate petitioner's storage and operating facilities. Petitioners contend that the work done and the money expended were merely to restore its property to its former condition and is, therefore, deductible under the tests set out in *Illinois Merchants Trust Co., Executor, supra.*

The respondent contends that the lot in question was originally a low, swampy lot which could not be utilized for any practical pur-

---

[3] SEC. 24. ITEMS NOT DEDUCTIBLE.

(a) GENERAL RULE.—In computing net income no deduction shall in any case be allowed in respect of—

(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate, except expenditures for the development of mines or deposits deductible under section 23 (cc) ;

(3) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made ;

poses because of this condition. The argument goes on that after the filling in and grading, the lot became more valuable and could be utilized for commercial purposes. In other words, the nature of the property was changed by the work done and its value increased accordingly.

As to the respondent's argument, there is no evidence that the smaller lot was "originally a low and swampy lot," as contended on brief by respondent. The only evidence as to the original condition of the property was that it was well drained when the tract was first put into use by Southern Ford. The evidence was that the smaller lot was of little or no practical value and was not used before the expenditure because of its long and narrow shape, and it was similarly of little or no practical value and was not used after the expenditure for the same reason. If we believe this evidence, and we see no reason to disbelieve it, we must conclude that the grading of the smaller lot was not done for the purpose of converting it to a new use, or making it more valuable, but to restore Southern Ford's property to its former ordinarily efficient operating condition. See *J. H. Collingwood*, 20 T. C. 937, and *Midland Empire Packing Co.*, 14 T. C. 635. We hold for corporate petitioner on this issue.

The last issue for our consideration deals with a claimed "repairs" deduction of Southern Ford for fiscal 1953. Southern Ford had a sprinkler system and an alarm system installed in fiscal 1953 in the building which it leased from Farm Industries. The cost of the sprinkler installation was $1,640. Petitioner concedes that this was a capital expenditure and should be capitalized. The sum of $816.48 was paid by Southern Ford to A. D. T. incident to the installation of the alarm system. This amount was deducted as repairs by Southern Ford which now contends that the amount was for continuing watchman service and is an ordinary and necessary business expense. The respondent disallowed the deduction and determined that the sum was paid for the installation of an alarm system and was therefore a capital expenditure depreciable over the life of the leased property. Our only problem is to determine whether the sum was paid for installation, as determined by the respondent, or for services, as contended by the corporate petitioner.

The contract, under which A. D. T. was to provide the alarm service, provided for both the installation of certain equipment and also a continuing "watchman type" service. The contract provided for the payment of $756 upon completion of installation and $613.80 annually in advance for a period of 5 years. It was also provided that any advance payments for service to be supplied subsequent to the date of any termination of the contract shall be refunded to the subscriber.

The sum paid by Southern Ford was paid pursuant to an invoice from A. D. T. The heading of this invoice was typed in as follows: "ADVANCE INSTALLATION CHARGE DUE TO CONSTRUCTION OF SPRINKLER SUPERVISORY AND WATERFLOW ALARM SERVICE; EFFECTIVE 8–1–53." As to the cost, the invoice listed $756 as a "Charge For Service" and $60.48 for "Federal Excise Tax," making a total of $816.48.

It appears to us that the $756 as listed on the contract was at least in part for the installation of the equipment used in the alarm service. There is no indication that any part of this sum was to be refunded if the contract was terminated. The only provision for such a refund was that any "advance payments made for service" to be supplied would be refunded if the contract were to be terminated. The invoice also indicates that the charge was for installation.

In any event, we hold that Southern Ford has failed to prove that the sum deducted was for anything other than determined by the respondent. The respondent therefore did not err in disallowing this expenditure as an ordinary and necessary expense.

*Decisions will be entered under Rule 50.*