OPINION. Kaum, Judge: 1. Section 162(a)(3), I.R.C. 1954, provides that there shall be allowed as deductions all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including “rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property * * Petitioner contends that the respondent erred in disallowing as a deduction part of the amounts it deducted in its returns for the taxable years as rent for the Kirk building. In considering a similar contention in Roland P. Place, 17 T.C. 199, 203, affirmed 199 F. 2d 373 (C.A. 6), certiorari denied 344 U.S. 927, this Court said: The basic question is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. The inquiry is whether the petitioner was in fact and at law “required” to pay these sums as rent. * * * When there is a close relationship between lessor and lessee and in addition there is no arm’s length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm’s length with a stranger. * * * Cf. Stanley Imerman, 7 T.C. 1030, 1037. The discussions during the latter part of 1953 which preceded and resulted in the January 1954 agreement were between J. W. Kirk and his son, John D. Kirk. J. W. Kirk was president of petitioner, a family corporation, and John D. Kirk, its vice president and treasurer. J. W. Kirk owned 50 per cent of petitioner’s voting stock and a substantial minority interest in its nonvoting stock; all of the remaining stock, voting and nonvoting, was owned by John D. Kirk and members of his immediate family. For some years prior to 1954, J. W. Kirk had received annual rent of $3,600 for the property in controversy. Although this may have been on the low side, we cannot, on this record, agree with petitioner’s contention that such rent was merely “token” or “nominal.” It was substantial and was not significantly outside the range of rents paid in Barnesville. At the time the lease was executed, J. W. Kirk was receiving not only the foregoing $3,600 rental from petitioner but also annual salary in the amount of $19,951,[1] or a total of approximately $23,500. However, in view of his prolonged periods of residence in Florida each year and intended' withdrawal from active conduct of the business, he determined not to accept any more salary. This meant that payments to him by the corporation would be reduced from approximately $23,500 to $3,600. While there is no direct evidence from which we can find that the increased rental, payable under the lease, was designed to fill the gap caused by the cessation of J. W. Kirk’s salary, the effect of the new arrangement was to achieve substantially that result. Petitioner’s annual net sales for a period of several years were in excess of $1 million, and the so-called rental based on 2 per cent of net sales was roughly equivalent to the aggregate amount that J. W. Kirk had been receiving from petitioner as salary and rent. Because of this, and the close relationship that existed between J. W. Kirk and John D. Kirk and the petitioner, the arm’s-length character of the transaction is suspect and all evidence bearing on it must be scrutinized to determine whether the amount payable under the agreement as rent was in excess of what petitioner would have been required to pay had it dealt at arm’s length with a stranger. Cf. Jos. N. Neel Co., 22 T.C. 1083, 1090. Three qualified real estate appraisers, two presented by petitioner and one by the respondent, expressed opinions as to the fair rental value of the Kirk building. Their opinions varied. The fair rental according to petitioner’s witnesses was 2 per cent of net sales, and according to respondent’s witness $9,000 per annum. We have given due consideration to the testimony of these experts, and all other evidence, and on the basis of the entire record have found that the maximum fair rent for the leased premises would not be in excess of $12,000 per annum. We cannot approve petitioner’s contention or accept the conclusory assertion of any witness that the transaction was negotiated at arm’s length. Whether a 2 per cent lease, or for that matter a 3 or 6 per cent lease, would have been reasonable as related to other property or to a different lessee, is beside the point. The question is whether the so-called rentals payable under this lease were so unreasonable as to justify the finding that a portion thereof was not rent at all and therefore not deductible as “rentals or other payments required to be made” for the continued use of the property. It must be remembered that Kirks conducted an unusual operation. Through aggressive advertising and a policy of low prices for its merchandise, it had achieved a level of sales that appeared to be wholly disproportionate to the small community in which it operated. More than 80 per cent of its customers came from distances in excess of 20 miles. Two per cent of petitioner’s net sales was productive of an alleged rental that appears to have been proportionately far in excess of 2 or 3 per cent of net sales of other types of business in Barnesville. Moreover, there is another significant factor that seems to have been ignored by petitioner’s expert witnesses. Although the lease was stated to be for a 5-year term, it was terminable annually by either party. It is therefore sharply to be distinguished from a percentage lease covering a fixed period of years. Cf. Stanley I merman, supra at 1037. The cancellation clause in effect permitted the parties to renegotiate the terms of the lease annually, requiring a forecast of sales for only a 1-year period in determining the expectable rent to be derived from the property during the coming year. In Stanley Imerman, supra, it was said (p. 1037): Many circumstances and considerations which may hare influenced the fixing of the amount of rent on the property for a term of years may not continue for the term or may not be present in some particular year or years of such term. That the amount of rent rises and falls with the trend of the business and is greater in the year or years when business is best is an accepted characteristic of a percentage lease. The situation there referred to is completely absent here, in view of the termination clause which would enable either party to insist annually upon a fair rent measured by the facts as they appear from year to year. Cf. also Southern Ford Tractor Corporation, 29 T.C. 833, 843. When the lease was executed in January 1954, the net sales of petitioner had enjoyed a steady growth over a long period of years, with at most only an occasional minor or temporary decline. By January 1954 annual net sales had exceeded $1 million for at least several years. No convincing evidence was submitted that a substantial decline in sales could reasonably be anticipated after the execution of the lease, and certainly not for so short a period as 12 months. In fact, sales continued to increase thereafter. Another consideration tending to show absence of arm’s-length dealing is the fact that some of petitioner’s selling was done at its warehouse, to the rear of the leased premises, as well as in the rented second floor space in the adjacent Belmont building. Yet, the net sales taken into account in determining its alleged rent included dll sales, whether made on the leased premises (Kirk building) or at the warehouse or in the adjacent Belmont building. Certainly, it is highly doubtful whether a lessee dealing at arm’s length would have consented to any such arrangement. The record does not show the extent of sales made at the warehouse or in the Belmont building, but we cannot assume in the absence of proof by petitioner that they were inconsequential. We need not prolong this opinion on this point. Suffice it to say, on the basis of the entire record, including evidence as to rents paid for other commercial properties in Barnesville, we are satisfied that the maximum fair rent for the leased premises was not in excess of $12,000 a year, that the lease was not negotiated at arm’s length, and that to the extent that the arrangement between petitioner and J. W. Kirk resulted in payments in excess of $12,000 a year such excess did not in fact constitute rent. Cf. Herbert Davis, 26 T.C. 49, 56. 2. Petitioner makes the alternative contention that if the amounts in controversy are not deductible as rent they are deductible as compensation paid for J. W. Kirk’s personal services. We do not agree. The evidence discloses that J. W. Kirk was spending about half of each year in Florida, and that he voluntarily agreed to take no salary beginning with the first fiscal year before us. Although there is evidence that he performed some services when in Barnesville, we are not convinced that such services were other than minimal. There is no evidence that when he was in Florida petitioner was required to hire someone else to do his work or that his services were not readily performed with negligible increased effort by other personnel already employed by petitioner. Nor are we satisfied by the evidence that he rendered any significant services by telephone or otherwise when he was in Florida. And the fact is that the amounts in question were not paid to J. W. Kirk as compensation. In the circumstances of this case, petitioner cannot now treat payments which have been held not to be deductible as rent as compensation for which they were not intended. Cf. Roehl Construction Co., 17 T.C. 1037, 1041. Multnomah Operating Co., a Memorandum Opinion of this Court, affirmed 248 F. 2d 661 (C.A. 9), relied upon by petitioner, is distinguishable. In that case there was a genuine question of fact as to whether the amounts in dispute were intended as rent or compensation, regardless of the label, whereas here, as in the Boehl case, there is no serious question as to what the controverted payments were intended to be. The payments herein were certainly not intended as compensation, and are not deductible as such. Decision will he entered for the respondent. Although $19,951 was his salary for the fiscal year ending January 31, 1954, his salary for the 3 preceding fiscal years was $17,490, $16,500, and $15,000, respectively.