International Color Gravure, Inc. v. Commissioner.
International Color Gravure, Inc. v. Commissioner
Docket No. 71655.
United States Tax Court
T.C. Memo 1961-15; 1961 Tax Ct. Memo LEXIS 331; 20 T.C.M. (CCH) 61; T.C.M. (RIA) 61015; January 26, 1961
James A. Cuddihy, Esq., 485 Lexington Ave., New York, N. Y., for the petitioner. Herbert Rothenberg, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioner's income tax for the fiscal years ending March 31, 1954 and 1955 in the respective amounts of $2,963.90 and $4,718.16. The issue remaining is whether, in each of the years, certain rental payments were required as a condition to the continued use or possession of leased machinery so as to constitute ordinary and necessary business expenses. Findings of Fact The stipulated *332 facts are found. Petitioner is a New York corporation. It filed its returns for the fiscal years in issue with the district director of internal revenue, Upper Manhattan, New York. Petitioner was organized in 1945 under the laws of New York. At all material times its capital stock was divided equally among William A. Milanese, Joseph Marnet, Frank Sportelli, James Indiveri and Michael Leuschner. Joseph Marnet was president of petitioner. At all material times petitioner has been engaged exclusively in a specialized type of printing business known as gravure engraving. In its operations petitioner utilized "No. 5" and "No. 7" presses. A "No. 5" press was a large press; a "No. 7" press was a small press. These presses were generally referred to in the trade as "L & M" presses. During 1945, petitioner leased a press from Publications Corporation. Sometime during the years 1945 through 1947 petitioner purchased a "Waide-Seville" press from Canadian Gravure, Toronto, Canada, for approximately $3,000. In the latter part of 1946, petitioner purchased a "No. 7" press from Crabtree, Ltd., Ottawa, Canada for $900. From December 1, 1946 through March 22, 1948, petitioner rented *333 a gravure press on an hourly basis from Cameo Die and Label Co., hereinafter called Cameo. The rental rate was $3 per hour. Cameo needed this press in its own business and leased it to petitioner when it was not in use. Petitioner operated the press on Cameo's premises. During this period, petitioner's total rental payments to Cameo were $3,250. In 1948, one or two of petitioner's shareholders contacted Rogers and Lerner Company, hereinafter called Rogers, in an effort to purchase a "No 5" press. Rogers was going out of the gravure business and offered to sell petitioner a "No. 5" press. In addition, two of petitioner's shareholders contacted Bert Rifenbury, hereinafter called Rifenbury, and asked him to locate presses for petitioner. Rifenbury was president of Modern Gravure, a company engaged in the engraving business. He located two "No. 7" presses in Canada and purchased them in the name of Modern Gravure for approximately $6,000. About the same time, petitioner's attorney, Arden H. Rathkopf (hereinafter called Rathkopf) and petitioner's shareholders discussed the problem of acquiring these presses. No bank or finance company was consulted. After considering petitioner's cash *334 balance and "extension program," the shareholders determined that petitioner was not in a position to buy these presses. It was suggested that the shareholders, or their wives, contribute moneys to petitioner, or that the wives purchase the presses and rent them to petitioner. Rathkopf suggested the formation of a separate corporation with the wives as shareholders. He felt it was easier to deal with a corporation than with five individuals. Shortly thereafter, in 1948, Graphic Equipment Corporation, hereinafter called Graphic, was organized. Its capital stock was divided equally among Elizabeth Milanese, wife of William A. Milanese; Annette Sportelli, wife of Frank Sportelli; Margaret Leuschner, wife of Michael Leuschner; Mrs. Andrew Marnet, mother of Joseph Marnet; and Olga Indiveri, wife of James Indiveri. Rathkopf became president of Graphic. During 1948, Graphic purchased the two "No. 7" presses from Modern Gravure for $9,262 and the "No 5" press for $13,750 from its shareholders, who had previously purchased it from Rogers. The total amount expended for the 3 presses was $23,012. Graphic paid for these purchases with the funds it had received from shareholders' subscriptions *335 to capital stock, shareholders' loans and a loan of $2,500 from Joseph Marnet. At that time the estimated useful life of each of these presses was 17 years. None of the 3 presses has an automatic feeder. Each is a hand-fed or operated press. Graphic leased, on a year to year basis, the 3 presses to petitioner at the rate of $1,000 per month for the "No 5" press and $750 per month for the two "No. 7" presses together, or a total annual rental of $21,000. Petitioner was responsible for repairs and insurance. Either party had the right to terminate the lease at the end of a year. At all material times the 3 presses have been located on petitioner's premises. On July 28, 1948, Graphic wrote petitioner and advised it that no rental had been received. Graphic agreed to reduce the rental of the 3 presses to $1,500 per month or a total annual rental of $18,000. Petitioner did not pay any of this rent during 1948. Subsequently, Rathkopf, on behalf of Graphic, wrote petitioner that if Graphic was not taken more seriously, he would dissolve it. In negotiating the amount of rent petitioner would pay Graphic for the 3 presses, the parties considered the rent petitioner had paid Cameo, *336 the amount of rent petitioner could afford to pay, and the maximum tax benefits to all of petitioner's and Graphic's shareholders. Graphic's income consisted solely of petitioner's rental payments. Graphic maintained no showrooms, had no employees and paid no salaries to its officers. It conducted its affairs from Rathkopf's law office. On November 15, 1950, Graphic was dissolved. Pursuant to the dissolution, Rathkopf hired Rifenbury to make an independent appraisal of Graphic's 3 presses. Rifenbury valued the presses as follows: The value of the smaller [presses] ["No. 7's"] was between $5,000 and $7,000 each and the value of the larger press ["No. 5"] was between $11,000 and $13,500, all values being dependent upon negotiation and the particular circumstances of the proposed buyer. As of November 15, 1950, Graphic's adjusted basis of the 3 presses was $19,572.85. After the dissolution of Graphic, each of its former shareholders received a 20 per cent interest in the two "No. 7" presses and one "No. 5" press. From fiscal 1947 through fiscal 1955, petitioner's balance sheets reflected assets, liabilities and capital, as follows (in even dollars): 1947
1948
1949
1950
1951
Assets
Cash
$26,421
$ 17,705
$ 37,939
$ 73,219
$ 35,404
Total current assets
60,576
66,177
108,065
128,378
108,874
(including cash)
Other assets
29,903
41,370
35,841
82,303
112,051
Total
$90,480
$107,547
$143,906
$210,682
$220,925
Liabilities and Capital
Current liabilities
$45,463
$ 50,369
$ 60,248
$ 91,916
$ 83,468
Other liabilities
2,000
18,243
Capital stock
20,000
20,000
20,000
20,000
20,000
Surplus
25,017
37,178
61,657
98,766
99,213
Total
$90,480
$107,547
$143,906
$210,682
$220,925
*337 1952
1953
1954
1955
Assets
Cash
$ 27,798
$ 75,120
$ 86,964
$ 72,535
Total current assets
111,927
201,932
181,552
189,579
(including cash)
Other assets
65,823
72,603
78,421
75,886
Total
$177,750
$274,536
$259,973
$265,465
Liabilities and Capital
Current liabilities
$ 95,485
$129,911
$114,377
$100,267
Other liabilities
1,774
Capital stock
20,000
75,000 *
75,000
100,000 *
Surplus
62,265
69,625
70,596
63,424
Total
$177,750
$274,536
$259,973
$265,465
From fiscal 1946 through fiscal 1955, petitioner's profit and loss statements reflected sales, rent, press rental and net profit (or loss) before taxes as follows (in even dollars): 1946
1947
1948
1949
1950
Sales
$181,701
$309,370
$353,844
$514,474
$579,975
Rent
6,945
6,000
6,689
8,922
11,121
Press Rental
1,000
18,150
18,568
Net Profit (or loss) before
4,434
31,992
15,663
39,508
60,481
taxes
1951
1952
1953
1954
1955
Sales
$522,989
$532,911
$816,319
$765,529
$853,641
Rent
15,000
15,083
16,249
17,000
17,000
Press Rental
18,000
18,000
18,000
18,000
18,000
Net Profit (or loss) before
569
(36,820)
85,973
1,278
30,478
taxes
*338 From 1948 through 1955, petitioner looked for presses for purposes of purchasing them. In 1948 and in 1954 and 1955, "No. 5" and "No. 7" presses were not manufactured anywhere in the world. As of February 4, 1960, the total number in the United States of "No. 5" and "No. 7" presses and a press known as "No. 4" was approximately 30. In addition to "No. 5" and "No. 7" presses there existed more expensive types of presses which could be used in petitioner's business. The "Miehle" gravure press is manufactured in the United States and must be purchased in units of six or more at a time. It is similar to, but larger than, a "No. 5" or "No. 7" press. At one time the price of a single-unit "Miehle" gravure press was $46,000. During 1953 and 1954, petitioner acquired used presses as follows: Estimated useful
Date of
Type of
life at date
purchase
press
of purchase
Cost
3-31-53
"No. 7"
10 years
$2,000
3-31-53
"No. 7"
10 years
2,000
11-5-54
"No. 7"
4 years
2,000
Intaglio Service Corporation is a nationwide gravure service enterprise and a competitor of petitioner. During 1953 and 1954, Intaglio Service acquired used presses as follows: *339 Date of
Type of
purchase
press
Cost
February 1953
"No. 5"
$5,000
February 1953
"No. 5"
5,000
April 1954
* "No. 7"
6,500
From 1948 through 1955, "No. 5" and "No. 7" presses were difficult to come by but obtainable. Champlain Company manufactured "No. 4" "L & M" presses which were delivered in 1949. It made a larger "L & M" press in 1951. In 1955, it imported new and used presses from England. From 1947 through 1949, Stoessel Company manufactured and sold presses. Petitioner purchased a press from Stoessel. Petitioner's shareholders determined that this press was unsatisfactory, whereupon Stoessel removed it and returned the purchase price to petitioner. Intaglio Service purchased new presses from Stoessel Company as follows: Date of
purchase
Cost
1947-1948
$5,500
1947-1948
5,500
August 1949
6,000
August 1949
6,000 The presses purchased in 1949 have been in continuous operation of Intaglio Service's business. National Equipment and Rental Company, Ltd., is engaged in the business of buying equipment for the graphic arts trade and then leasing such equipment to printers in the trade. The *340 rental rate is 2 per cent of cost per month for 65 months with certain options granted to the lessee during and after the term of the lease. During the years in controversy petitioner leased from the former shareholders of Graphic two "No. 7" presses and one "No. 5" press. These were the same 3 presses leased from Graphic until its dissolution. Petitioner reported as "Cost of Goods Sold" on each of its 1954 and 1955 returns a "Press Rental" for the 3 presses in the amount of $18,000. Respondent's engineer agent reviewed petitioner's and Intaglio Service's history of press purchases. He had discussions with Champlain Company and Stoessel Company, two press manufacturers. After an inspection the agent estimated the fair market value of the 3 presses leased from the former shareholders of Graphic, as of March 31, 1954, as follows: Type of
Fair market
press
value
"No. 7"
$ 7,500
"No. 7"
7,500
"No. 5"
11,000
Total
$26,000 One of the factors considered in this estimate was the limited availability of such presses. The agent then concluded that a fair rental allowance for the 3 presses was approximately $8,000 per year. This was computed as follows: Percentage
Item
of cost
Depreciation
10
Cost of borrowing money to purchase
presses
5.5
Overhead
5
Ready to serve charge
5
Total cost of ownership
25.5
Fair Profit: 15% of cost of ownership
4
Total
29.5
Fair Rental: Fair market value - $26,000 X 29.5%
$7,670
*341 In his deficiency notice, respondent disallowed $10,000 of the reported "Press Rental" deduction for each year. The lease agreement between petitioner and the former shareholders of Graphic providing for petitioner's use of the 3 presses was not entered into at arm's length. The rentals paid were unreasonably high. In fiscal 1954 and 1955 amounts paid as rent by petitioner exceeding $8,000 per year were not required to be made as a condition to the continued use and possession of the 3 presses. Opinion Whether the amounts in controversy constituted deductible rental payments within [1]section 23(a), I.R.C. 1939, and section 162, I.R.C. 1954, is purely an issue of fact. See Southern Ford Tractor Corporation, 29 T.C. 833. This has been disposed of by our findings. *342 As we said in Herbert Davis, 26 T.C. 49, 56: * * * In circumstances where the lessor and the lessee are closely related and their dealings have not been at arm's length, the transaction offers a ready means for channeling earnings from one member of a family to another, and invites careful scrutiny to determine whether the amounts paid as rent were required to be so paid within the meaning of the statute. Roland P. Place, 17 T.C. 199 (1951), affirmed per curiam (C.A. 6, 1952) 199 F. 2d 373; Stanwick's Inc., 15 T.C. 556 (1950), affirmed per curiam (C.A. 4, 1951) 190 F.2d 84. * * * We need only inquire into the extent, if any, to which such payments were in fact in excess of what was required to be made as a condition to the continued use and the occupancy of the property. To the extent of any such excess, the payments are not deductible. In Roland P. Place, supra, we said (p. 203): "The basic question is not whether these sums claimed as a rental deduction * * * were in fact rent instead of something else paid under the guise of rent. The inquiry is whether the petitioner was in fact and at law 'required' *343 to pay these sums as rent. * * *" Such an inquiry in a situation involving a family transaction requires a careful examination of the circumstances surrounding the rental of the property to determine the intentions of the parties in agreeing upon a lease and in fixing the terms thereof. In this connection, consideration must be given to the reasonable rental value of the property had the lease been entered into in an arm's length transaction. As we said in Jos. N. Neel Co., 22 T.C. 1083 (1954), "a critical examination of all the evidence bearing upon the transaction involved, * * * is required to determine the true character of the item * * *." The absence of similar and comparable leases, the rather limited market for presses, and the previous lease of property, not necessarily the duplicate of that involved here, from a stranger under clearly distinguishable conditions, are all considerations to be taken into account in arriving at the requisite conclusion. But nothing in the record can in our opinion sustain petitioner's burden of proof. Not only has it failed to demonstrate objectively what a fair rental should be, but it was unsuccessful in controverting the computations *344 of respondent's engineer agent who, in applying a cost of ownership plus fair profit percentage against fair market value, considered the availability factor. His determinations of fair market value, exceeding as they did the actual cost and eliminating all depreciation, were, if anything, overgenerous. The entire record shows that such presses were not unavailable, petitioner not having rebutted the evidence of sales of "No. 7," "No. 5" and other usable presses during the controversial period. To this it might be added that petitioner has not demonstrated that the amount of $18,000 apparently paid to the lessors was required as a condition for the continued use of the presses in the fiscal period in question. And if we assume that it was payable by virtue of a continuing ratification of the original lease with Graphic, [2] the conclusion is required that this amount was unreasonably high in light of the circumstances. In reaching these conclusions we have considered the inherent risks to lessors *345 operating under agreements which are subject to annual renegotiation. But militating against this, and hence, making any argument along this line unconvincing, is the fact that large rental profits had already been realized in previous years. And this is not an instance of percentage rental where perhaps the lessor's risk is compensation for high earning years. See Southern Ford Tractor Corporation, supra, at 843. The consequence is that in our view petitioner has failed to prove that a rental figure for the presses reasonably required for their continued use during the years in dispute exceeded that which respondent has allowed. Decision will be entered for the respondent. Footnotes
*. Increase reflected stock dividends.↩
*. With automatic feeder.↩
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *
(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩
2. Petitioner's contention that it could not buy the presses because of the cash outlay is difficult to reconcile with its willingness to pay almost the entire cost as rent for 1 year.↩