ROBERT J. TERRIS AND JUDITH A. TERRIS, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Terris v. Commissioner
Docket No. 8252-81.
United States Tax Court
T.C. Memo 1983-29; 1983 Tax Ct. Memo LEXIS 758; 45 T.C.M. (CCH) 530; T.C.M. (RIA) 83029; January 17, 1983. K. G. Seitz, for the petitioners. Eugene P. Bogner, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined a deficiency of income tax of $10,227.04 against the petitioners for the calendar year 1977. The sole issue which we must decide is whether petitioner Robert J. Terris received a dividend in the year 1977 from a corporation in which he was a shareholder, and, if so, the amount thereof. [1]
*759 Some of the facts were stipulated, and such stipulation, with accompanying exhibits, is incorporated herein by this reference. FINDINGS OF FACT Petitioners are husband and wife who resided in Cincinnati, Ohio at the time the petition herein was filed. Their joint income tax return for calendar year 1977 was filed with respondent's Cincinnati Service Center. During the year 1977, petitioner Robert J. Terris (hereinafter "petitioner"), [2] together with his father, were the sole shareholders of a corporation known as Ohio Land Investments Inc. (hereinafter "the corporation").Petitioner was also an employee of the corporation. The business of the corporation was the construction of new homes for sale to the public. In the year 1977, the corporation had acquired a 54.05 acre tract of land, which it subdivided into a residential development called Amherst Acres, and was engaged in the construction of three - and four - bedroom homes thereon, ranging in size between 1,400 and 2,200 square feet each. As originally conceived, Amherst Acres was to have 177 homes *760 built on it by the corporation. The corporation did not do custom construction in Amherst Acres in accordance with the buyer's specifications. Rather, the corporation had several different sets of standard plans, or "stock models" of homes which it constructed to sell "on speculation," i.e., to the general market. Homes in Amherst Acres were given names according to their floor plan and external appearance, which was standard within the class. Among the homes developed and built was a style of home called "Manitoba C." The stock model houses which the corporation built and sold were offered to the public as complete homes, and the selling price included, inter alia, all wiring, plumbing, heating and air-conditioning (by heat pump), bathroom fixtures, all window and door shades, venetian blinds, awnings, curtain rods, window and door screens, storm windows and storm doors, affixed wall mirrors, drapery rods, attached linoleum, wall-to-wall carpeting, stair carpeting, built in stoves, refrigerators and dishwashers, landscaping, shrubbery and attached television aerials. The corporation refused to make structural changes to its standard house models, and would make no changes *761 to standard equipment after it was installed.However, if a buyer contracted to buy one of the corporation's homes while the house was still under construction, and before the standard equipment had been installed, he could arrange with the corporation in some cases to have a higher quality of equipment installed, e.g., higher quality linoleum or kitchen cabinets, for which the corporation would make an extra charge. In the Manitoba C homes, such "extras," if ordered by the buyer, might result in an addition to the purchase price of as much as $500. Under the corporation's plan of operations in 1977, as soon as the decision was made to build a particular model house on a certain lot in Amherst Acres, the house was offered for sale to the public. A sales price for the house to be constructed was fixed at that time. In fixing the offering price of the house, primary consideration was given to existing and projected market conditions, and the going sales prices of comparable houses in the area, together with the size and model of the particular house being built. Although the corporation took estimated costs into consideration, based on its historical experience, and hoped and expected *762 to make an overall profit on the development of the subdivision, its offering price of a particular house was fixed prior to the time the actual construction costs of that house were known. As to a specific house, the actual cost of construction could vary, depending on such factors as costs of material and labor, and variations in the topography and subsoil conditions of the particular lot.Although the corporation might change the offering price of a given house from time to time, to give effect to such variables, as well as changing market conditions, the offering price of a given house at a given time was fixed and non-negotiable, so far as the prospective purchaser was concerned.The corporation kept separate cost records as to each house which it constructed, to which the costs of the particular job were charged. It allocated a standard cost of $9,778.45 to each lot for land and subdivision costs. In about the month of February, 1977, and within a 30 day period, the corporation began construction at Amherst Acres on three different Manitoba C houses which were known as job numbers 118, 128 and 137. On July 22, 1977, the corporation sold a Manitoba C home known as job number *763 128 to an unrelated customer for a selling price of $62,200. The corporation's records reflected a cost with respect to this job of $34,893.33. On August 18, 1977, petitioners purchased a Manitoba C home known as job 118 for a price of $50,000. The corporation's records reflect a cost of $40,551.03 with respect to this construction. At some point between July 22, 1977 and November 26, 1977, the corporation advanced its selling price for the Manitoba C home by $2,200. This was not the only time in 1977 that the corporation raised its selling price. On November 26, 1977, the corporation sold a third standard Manitoba C home in Amherst Acres, known as job 137, to an unrelated customer for a price of $64,400. The corporation's records reflect a cost of $36,511.93 with respect to this job.
The sales prices for the above three Manitoba C houses were inclusive of all the fixtures, floor coverings and accessories as detailed in our findings above herein. Upon audit of petitioners' 1977 joint income tax return, respondent determined that petitioners had purchased their Manitoba C home from the corporation for a price which was less than its then fair market value, and that such *764 purchase therefore constituted a taxable dividend to petitioner to the extent of the difference between the purchase price which he paid ($50,000) and the fair market value of the house, which respondent determined to be $78,144.62. Respondent arrived at his determination of fair market value by the following method: (a) Respondent determined that the Manitoba C house known as job number 137 was the house most closely comparable to petitioners' house (job 118), and that job number 137 had sold for a price of $64,400. (b) Respondent then listed the following additional amounts for what respondent determined to be the fair market value of the "extras" in petitioners' house: Ceramic tile
$595.00
Vinyl and Carpet
2,256.83
Kitchen Cabinets
821.06
Sink top and Vanity
332.29
Brick fireplace materials
1,787.44
Insulation
922.00
Heating and Air-conditioning
2,530.00
Labor to install
4,500.00
TOTAL
[3] 13,744.62
*765 Respondent then added the two above sums together to produce a total of $78,144.62, and accordingly determined that petitioner had received a dividend through the "bargain purchase" of the Manitoba C house known as lot 118 in the amount of $28,144.62. In fact, said "extras" were included in the selling price of $64,400 for job 137. The year 1977 was a good one for homebuilders, in terms of market prices, and at all times relevant hereto the corporation had at least $28,144.62 of earnings and profits. Petitioners reported no income in their 1977 income tax return resulting from their purchase of the property known as job 118. At the time of their purchase, the property had a fair market value of $64,400. OPINION The instant case involves a dispute between the parties with regard to the amount of taxable dividend, if any, which was received by petitioner in 1977 by reason of his having purchased a house from the corporation in which he was a shareholder, at a price which was less then its fair market value at that time. The applicable law is clear. [4]With exceptions not here *766 relevant, a distribution by a corporation to an individual shareholder with respect to his stock, made in money, securities or any other property constitutes a dividend to said shareholder to the extent of the distributing corporation's available earnings and profits, sections 301, 316, 317, and such dividend is includable in the distributee's gross income. Section 61. In the specific situation presented herein, respondent's pertinent regulations provide: If property is transferred by a corporation to a shareholder which is not a corporation for an amount less than its fair market value in a sale or exchange, such shareholder shall be treated as having received a distribution to which section 301 applies. In such case, the amount of the distribution shall be the difference between the amount paid for the property and its fair market value * * *. [Reg. section 1.301-1(j), Income Tax Regs.] The *767 above proposition is firmly established in the law, see Palmer v. Commissioner,302 U.S. 63 (1937); Southern Ford Tractor Corp. v. Commissioner,29 T.C. 833 (1958). Petitioners concede the correctness of the above principles, arguing only that respondent's determination of fair market value was erroneous, as demonstrated by the facts in this record. Respondent, on the other hand, contends that petitioners have failed to carry their necessary burden of proof in showing that his determination of fair market value was in error.Respondent's determination in this matter is presumptively correct, and the burden of proof is upon petitioner to show error therein. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
The dispute between the parties is thus essentially factual. As the record indicates, and our findings show, respondent's determination as to the fair market value of petitioners' Manitoba C house was made up of two elements: (a) Respondent determined that petitioners' house was most closely comparable to the Manitoba C house known as job number 137, which sold for a price *768 of $64,400 in November 1977. Petitioners, on the other hand, contend that the house in issue was more closely comparable to Manitoba C house number 128, which sold for a price of $62,200. The corporation's president, who was also petitioner's father, testified that during the period between July and November 1977, the corporation had advanced its selling price for the Manitoba C house by $2,200, but he was unable to pinpoint the exact date. The record herein shows that all three houses were the same model, and were constructed in the same subdivision at about the same time. We can find nothing in this record that persuades us that respondent committed error in basing the fair market value of petitioners' house, initially, upon the sale price of $64,400, at which job number 137 sold to an unrelated party, and accordingly we will not disturb it. (b) With respect to the second part of respondent's determination, however, we think that petitioner has demonstrated error. The corporation's president testified at trial that the sale price of the Manitoba C house, including job number 137, included all the fixtures and furnishings which respondent listed as "extras." His testimony *769 was credible, clear, and, on this most important point, was not shaken on cross-examination. Respondent offered no evidence to rebut it, and we have therefore concluded, and found, that respondent "doubled up" on petitioner by including in his computation of fair market value the alleged values of so-called "extra" items which in fact were already included in the overall standard purchase price. In this case, since respondent's determination of fair market value was based upon two clearly identifiable segments, it is possible to eliminate the error which respondent committed with respect to the second segment, without disturbing the first, on which petitioners have failed to demonstrate any error. Accordingly, we have found that petitioners' house had a fair market value of $64,400 at the time he purchased it for price of $50,000, with the result that we hold that petitioner received a taxable dividend in 1977, resulting from the bargain purchase of his house in Amherst Acres, in the amount of $14,400. Decision will be entered under Rule 155.
Footnotes
1. Other adjustments made by respondent in his statutory notice, which were contested in the petition herein, are so called "technical" adjustments resulting from respondent's determination on the principal issue herein, and will be appropriately adjusted by resolution of that issue.↩
2. Petitioner Judith A. Terris is involved herein only by reason of having file a joint return with her husband.↩
3. The details of respondent's methodology were not shown in his statutory notice of deficiency, but were disclosed in a preliminary report of respondent's examining agent. Respondent admitted that his determination in the statutory notice was derived exactly from this computation.↩
4. All references to Code sections herein are to the provisions of the Internal Revenue Code of 1954, as in effect in the year in issue, unless otherwise noted.↩