Roark Furniture, Inc. v. Commissioner.
Roark Furniture, Inc. v. Commissioner
Docket No. 88793.
United States Tax Court
T.C. Memo 1963-51; 1963 Tax Ct. Memo LEXIS 294; 22 T.C.M. (CCH) 193; T.C.M. (RIA) 63051; February 20, 1963
*294 Held, that rentals paid pursuant to a percentage of sales lease between two corporations controlled by the same stockholders, were excessive. Amounts of fair rentals that would have been "required" to be paid for the use or possession of the property covered by the lease, if the parties thereto had negotiated as strangers dealing at arm's length, determined. Charles W. Slicer, Esq., 734 Third Nat. Bldg., Dayton, Ohio, and Shearl J. Roberts, Esq., for the petitioner. Gene E. Hutson, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in the income taxes of the petitioner, as follows: *295 Taxable Fiscal Year
Ended September 30
Deficiency
1956
$19,584.31
1958
8,692.69
1959
6,797.43
For petitioner's fiscal year ended September 30, 1957, the respondent did not determine any deficiency. However, as the result of certain adjustments, he did reduce the amount of petitioner's claimed net operating loss for that year, which had the effect of reducing the amount of petitioner's net operating loss carryback to its fiscal year 1956. The sole question for decision is: What amount is deductible by petitioner as rent for each of its fiscal years 1956 through 1959, under section 162(a)(3) of the 1954 Code, for the occupancy of certain properties used in its business, which it leased from a related corporation, Roark Investment Company? Another issue raised by the pleadings, relating to deductions for depreciation in respect of certain trucks used by petitioner in its business, was conceded by petitioner at the trial. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits identified therein, is incorporated herein by reference. The petitioner, Roark Furniture, Inc., is an Ohio corporation, with its *296 principal place of business at Laura, Ohio. Throughout the taxable years here involved, petitioner operated a business of selling at retail - furniture, rugs, household appliances, house trailers, guns, and other miscellaneous merchandise (hereinafter, for convenience, called simply "the furniture business"). It filed a Federal income tax return for each of its fiscal years ended September 30, 1956 through 1959, with the district director of internal revenue at Cincinnati, Ohio. Petitioner had been preceded in its corporate operation of the furniture business at Laura by a sole proprietorship, which belonged to Hobart Roark (subsequently president of petitioner), who had begun his proprietorship operations in about 1948. Laura is a small village, having a population during the taxable years of about 450, which is located in Miami County, Ohio. The distance from Laura to the center of Dayton (the largest city in petitioner's general area) is approximately 25 miles, and the driving time between these two points is roughly 30 minutes. The proprietorship was a "high volume, low markup" merchandising operation; and it pursued an aggressive advertising campaign in the Dayton newspapers *297 and through the media of the radio and television stations of that city, in its efforts to attract customers. The great majority of its customers did in fact come from Dayton. By September 1955, the proprietorship's operations were carried on in a group of several adjacent buildings in Laura; and it also utilized two buildings for warehouse purposes, which were located in the neighboring small, rural communities of Pitsburg and West Milton. A brief description of these properties is as follows: 1. The "corner building," lot 122, Laura. - This was a 1-story conventional small town brick store building, used by the proprietorship for the display and sale of bedroom furniture. The "corner building" contained 3,220 square feet of floor space. To the rear of the "corner building," there was an unimproved ground area containing 3,040 square feet; but the record is silent as to the particular use made of this lot. 2. The Roark residence, lot 121, Laura. - This was a 2-story brick residence building, located adjacent to the "corner building," Only the first floor and the basement were used in the proprietorship's business - the first floor, for the display of living room furniture in *298 homelike surroundings; and the basement, for holding sales training classes for the proprietorship's sales personnel. The balance of the building was used by said Hobart Roark as his personal residence. 3. Cottage and garage, lot 121, Laura. - These were small buildings, containing 676 and 506 square feet of floor space, respectively, which were located on the same lot as, and to the rear of, the Roark residence. The cottage, like the first floor of the residence, was utilized to display furniture in homelike surroundings. The garage was used in the proprietorship's business in a manner not shown by the record. The structural characteristics of these buildings are not revealed by the evidence. 4. 1-story brick store building, lot 120, Laura. - This was a conventional store building, situated adjacent to the Roark residence, and containing 1,250 square feet of floor space, where living room furniture was displayed and sold. 5. 1-story cement-block building, lot 120, Laura. - Said building was located to the rear of, and it was connected by a covered passageway with, the justmentioned 1-story brick store building. The 1-story cement-block building, containing 3,166 square feet *299 of floor space, served as a display and sales area for both living room furniture and large household appliances, such as refrigerators and home freezers. 6. 2-story cement-block building, lot 119, Laura. - This 2-story building, containing 5,162 square feet of floor space, was used as the display and sales area for chairs, end tables, breakfast room sets, television sets, and rugs. In the front of said 2-story cement-block building was a 3,600 square foot plot of ground, that was used for the display of lawn furniture in the late spring and summer months, and for the display of house trailers at other times during the year. 7. Pitsburg-No. 1 building, lot 15, Pitsburg, Ohio. - This was a 2-story brick store building, containing 12,312 square feet of floor space; and it was used by the proprietorship for warehouse purposes. Pitsburg lies about 4 1/2 miles west of Laura. 8. West Milton warehouse, lot 142, West Milton, Ohio. - This structure had formerly served as a tobacco warehouse. It was of wooden construction, having two floor levels, and containing an aggregate of 15,604 square feet of floor space. West Milton lies about 5 miles southeast of Laura. None of the buildings *300 among the above properties, with the exception of the Roark residence, had modern plumbing facilities; none had sprinkler systems for fire protection; and none had central heating. Nor did any of the 2-story buildings have an elevator. The age and physical condition of these several buildings are not established by the evidence. All of the above-described properties were, prior to October 1, 1955, owned in fee simple by the proprietor, Hobart Roark. The gross sales of the proprietorship operated by Hobart Roark in the years 1948 through 1954, and for the 9-month period from January 1 through September 30, 1955, were as follows: 1948
$ 169,335.59
1949
232,253.16
1950
568,336.51
1951
797,635.41
1952
1,150,097.23
1953
1,452,680.96
1954
1,848,905.70
1955 (Jan. 1 to Sept. 30)
1,537,265.41
In about July 1955, Roark retained the services of William Fry, a certified public accountant who also rendered management consultant services to numerous businesses in Dayton and the surrounding counties, including Miami County where the Roark business interests were located. In the course of analyzing Roark's business activities and his assets and liabilities, Fry learned *301 that Roark was not only operating his furniture business proprietorship, but that he was also constructing a small residential subdivision in the vicinity of Laura, and had substantial other real estate holdings. Fry concluded and recommended to Roark that, for the purpose of securing limited liability and also for the purpose of lessening the burden of Federal income taxes, Roark should form two corporations - one to conduct the furniture business, and the other to hold real estate and carry on construction activities, each of which would be taxable at the rate of 30 percent if its net income did not exceed $25,000. Roark accepted Fry's recommendations, and on October 1, 1955, there were organized two corporations, Roark Furniture, Inc. (the petitioner in this case), and Roark Investment Company - both incorporated under the laws of Ohio. On the same date, all of the assets of Roark's furniture business proprietorship (exclusive of the real properties that had been used therein) were transferred to the petitioner solely in exchange for the common stock of the petitioner. Also on the same date, all of Roark's real estate holdings were transferred to the Investment Company, solely *302 in exchange for its common stock. At the time of the organization of these corporations, Hobart Roark received all of the petitioner's stock; while, with respect to Investment Company, he received 90 percent of that corporation's stock, and his wife, Thelma Roark, received the remaining 10 percent. Roark continued to own 100 percent of petitioner's outstanding stock throughout 1956 and 1957; and during the years 1958 and 1959 he owned over 93 percent of its stock. As regards the Investment Company, the shareholdings remained unchanged throughout 1956 and 1957; but in 1958 and 1959, Roark's wife acquired from him an additional 2.5 percent of the Investment Company's outstanding shares. The officers of the two corporations were the same persons throughout the taxable years involved: Hobart Roark, president; Robert Roark, vice president (relationship, if any, to Hobart and Thelma Roark is not shown by the record); and Thelma Roark, secretary-treasurer. Immediately after the formation of the two corporations, as just described, it became necessary that a lease be drawn up between the Investment Company, as lessor, and the petitioner corporation, as lessee, covering the real properties *303 which were then being used by the petitioner in the furniture business. Roark, who was president of each corporation, thereupon consulted the above-mentioned accountant, Fry, and asked that he confer with Roark's attorney and that a lease be drafted for execution by the two corporations covering the real properties of the Investment Company, which were to be used by the petitioner. Fry and the attorney thereafter recommended to Roark that a lease providing for a rental based on fluctuating percentages of the petitioner corporation's sales, with a fixed minimum rental per year, should be used. Subsequently, on October 15, 1955, an instrument captioned "lease" was executed by Roark Investment Company, as lessor, and the petitioner corporation, as lessee, by the terms of which petitioner leased the use and occupancy of the land and buildings on lots 119, 120 and 122 in Laura, and the above-described premises with improvements thereon in Pitsburg and West Milton, for a term of 5 years. The rentals provided for in said lease were as follows: An amount equal to 1 1/2 percent of the first $1,000,000 of petitioner's net sales; 1 percent of the next $1,000,000 of net sales; and 3/4 of 1 percent *304 of all net sales in excess of $2,000,000, with a minimum rental of $15,000 per year. Although portions of the Roark residence on lot 121 in Laura (together with the cottage and garage on said property) were then being used in petitioner's business operations in the manner above described, no mention was made of such premises in the lease. Also, said lease provided that petitioner would keep the premises in a good state of repair and pay all charges therefor. Subsequent to the execution of the foregoing lease, the Investment Company either constructed or acquired additional facilities and properties which were used by the petitioner in its business, from and after the dates of acquisition or construction. Said additional facilities and properties were as follows: 1. Pitsburg-No. 2 store building and garage, lot 15, Pitsburg, Ohio, acquired in May 1956. - These were a 1-story brick store building with attic, and also a garage on the same lot, located next door to the above-described Pitsburg-No. 1 property. Pitsburg-No. 2 and the garage contained an aggregate of 3,463 square feet of floor space. Said premises were used for warehousing, and also for the display and sale of secondhand *305 furniture. The cost of the Pitsburg-No. 2 property was $6,826.69. 2. The Walker House, lot 100, Laura. - This was a residential property, containing 2,700 square feet of floor space, and was used to display Early American period furniture in its natural setting in a house. It was acquired in September 1956, at a cost of $6,000. 3. The Grove House, lot 99, Laura, was also a residential property acquired in October 1956, at a cost of $6,000 and was used by the petitioner in the same way as the Walker House. It contained 2,528 square feet of floor space. Both the Grove and the Walker Houses are situated directly across the street from the store buildings on lots 119, 120, and 122 which have been described above. Between the Grove and Walker Houses, and located on the same lots as these houses, is an open space which was used by the petitioner as a display and sales area for house trailers, from and after the time when the Grove House was acquired. A portion (2,800 square feet) of this open space was black-topped; and the remainder (13,536 square feet) was hard surfaced with gravel. The cost of surfacing this area was $1,903.78. 4. New office building, lot 119, Laura, was a small *306 1-story addition to the above mentioned 2-story cement-block building, which contained 720 square feet of floor space. The office building addition was constructed by the Investment Company in June 1957, at a cost of $3,146.74. 5. Loading room and rest rooms, lot 119, Laura, comprised a single addition to the 2-story cement-block building. The loading room contained 383 square feet, and the rest rooms 310 square feet. They were constructed by the Investment Company at a cost of $6,782.35, at an undetermined date during the year ended September 30, 1958. 6. Old fire house building, Laura, was acquired during the year ended September 30, 1958. It contained 1,056 square feet of floor space, and was apparently used by the petitioner as a warehouse. The cost of this building to Investment Company was $1,709.17. Both of the properties in Pitsburg, Ohio, were sold by the Investment Company to a third party in March 1957, for the aggregate price of $12,000. Petitioner continued to use these properties, but the record contains no evidence as to the amounts of rent which petitioner paid with respect to the same. The net sales of the petitioner corporation for each of its fiscal years *307 ended September 30, 1956, through 1959, were as follows: Year ended
Sept. 30
Net Sales
1956
$2,186,703.05
1957
2,179,275.35
1958
2,017,614.86
1959
2,434,884.22
During each of the years ended September 30, 1956, through 1959, petitioner paid rentals to Investment Company on the above-described real properties which it used in its business; and these rentals were computed in accordance with the terms of the lease agreement, without any adjustment to reflect the use of the six additional properties acquired after October 1, 1955, or the disposal of two of the properties in 1957. The rentals thus paid to Investment Company in each such year, were as follows: Year ended
Sept. 30
Rentals paid
1956
$26,400.27
1957
26,344.57
1958
25,132.11
1959
28,261.63 Petitioner included the foregoing amounts in the deduction for rent expense, which it claimed on its Federal income tax returns for the taxable years involved. As heretofore found as a fact, the Roark residence on lot 121, together with the adjacent cottage and garage on said lot, were not mentioned in the lease agreement. From the time when Investment Company acquired title to these *308 properties in October 1955, until October 1956, the same were used in part as the personal residence of Hobart Roark and in part by petitioner in its business; however, neither of these occupants paid any rental therefor. Beginning in October 1956, and continuing throughout the taxable years, Roark paid $75 per month to Investment Company for his personal use of part of the residence; but petitioner paid no rentals for its use of the remaining portions of said three properties. The following table shows, for the Investment Company, its total income, the portion thereof derived from rents, and its net income, for each of its fiscal years ended September 30, 1956, through 1959: Year ended
Total in-
Net in-
Sept. 30
come
Rents *
come
1956
$32,804.68
$28,200.27
$18,990.27
1957
29,780.44
28,144.57
13,593.98
1958
30,303.09
28,033.61
12,354.00
1959
33,335.62
29,751.13
13,897.37
Respondent, on audit of the petitioner corporation's income tax returns for *309 the taxable years involved, disallowed a portion of the deductions for rent expense claimed on said returns. The following table shows for each such taxable year: (1) the total amount of rent expense claimed by petitioner; (2) the portion thereof representing rentals paid to Investment Company; (3) the amount of the total rent expense deduction which respondent disallowed; and (4) the amount of the total rent expense deduction which the respondent allowed: Rentals paid by
petitioner to
Total rent ex-
Investment
Portion of rent
Rent expense
Year ended
pense deduc-
Company
expense deduc-
deduction
Sept. 30
tion claimed
only
tion disallowed
allowed
1956
$28,078.27
$26,400.27
$17,780.67
$10,297.60
1957
26,694.57
26,344.57
18,592.54
8,102.03
1958
27,542.11
25,132.11
18,421.35
9,120.76
1959
30,685.00
28,261.63
21,564.24
9,120.76
Ultimate Finding of Fact The amounts of the fair rentals which would have been "required" to be paid for the use or possession of the real properties owned by Investment Company and leased to petitioner corporation for use in its retail furniture business, in a lease entered into at arm's *310 length and between strangers, during each of the taxable years here involved, are as follows: Rent for year ended September 30
1956
1957
1958
1959
Corner building (lot 122), together with un-
improved ground area at the rear thereof
$ 1,600
$ 1,600
$ 1,600
$ 1,600
Portion of Roark residence (lot 121) [1]
360
360
360
360
Roark cottage (lot 121) [1]
500
500
500
500
Roark garage (lot 121) [1]
150
150
150
150
1-story brick store building (lot 120)
1,080
1,080
1,080
1,080
1-story cement-block building (lot 120)
2,400
2,400
2,400
2,400
2-story cement-block building (lot 119)
$ 3,600
$ 3,600
$ 3,900 [2]
$ 3,900
Plot of ground in front of 2-story cement-
block building
60
60
60
60
Walker House (lot 100)
75 [3]
900
900
900
West Milton warehouse
2,000
2,000
2,000
2,000
Pitsburg - No. 1
1,860
930 [4]
Pitsburg - No. 2 and garage
225 [5]
270 [6]
Grove House (lot 99)
850
850
850
Gravel and black top lots between Grove
and Walker Houses
420
420
420
New office building (lot 119)
200 [7]
600
600
Fire house building
300
300
$13,910
$15,320
$15,120
$15,120
*311 Opinion Section 162(a)(3) of the 1954 Code, which is here the controlling statute, provides as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *
(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. It is a well-established principle in the law of taxation that in cases where a lease agreement has been entered into by and between related parties (as for example between corporations controlled by substantially the same individuals), who because of their relationship may not have dealt at arm's length, the most careful and searching scrutiny must be given to the transaction, in order to determine if the "rent" called for in the lease is actually "required" to be paid for the use or possession of the properties covered by the lease. The principles which guide our application of the statute to the facts *312 of this case were succinctly stated by the Court, in the oftcited case of Roland P. Place, 17 T.C. 199, 203, affd. (C.A. 6) 199 F. 2d 373, certiorari denied 344 U.S. 927, as follows: The basic question is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. The inquiry is whether the petitioner was in fact and at law "required" to pay these sums as rent. See section 23(a)(1)(A) [n1] of the Internal Revenue Code. When there is a close relationship between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. Manos v. Commissioner, 187 F. 2d 734; Stanwick's, Inc., 15 T.C. 556, affd. (C.A. 4) June 25, 1951 [190 F. 2d 84]; Limerick's, Inc., 7 T.C. 1129, affd. 165 F. 2d 483; Hightower v. Commissioner, 187 F. 2d 535. *313 See Commissioner v. Lincoln Electric Co., 176 F. 2d 815 [Footnote omitted.] See also to the same effect, J. J. Kirk, Inc., 34 T.C. 130, 136-139, affd. percuriam (C.A. 6) 289 F. 2d 935. The question is a factual one. Southern Ford Tractor Company, 29 T.C. 833, 842; Utter-McKinley Mortuaries v. Commissioner, (C.A. 6) 225 F. 2d 870, affirming a Memorandum Opinion of this Court. Petitioner candidly stated in its brief: At the outset, the Petitioner concedes that Roark Furniture, Inc., as Lessee, and Roark Investment Company, as Lessor, were closely related corporations and therefore, the rents paid by the Petitioner should be closely examined to determine that they are reasonable. In view of this concession, we have closely scrutinized and weighed all the evidence, and have concluded that strangers dealing at arm's length would not have agreed upon the rentals provided for in said lease, and that such rentals were excessive. Based on our consideration of all the evidence we have found as an ultimate fact, and we here hold, that the fair rentals "required" for the use or possession of the properties rented by petitioner *314 from Investment Company are as follows: Year ended
Rental re-
Sept. 30
quired
1956
$13,910
1957
15,320
1958
15,120
1959
15,120 The foregoing amounts are considerably higher than those allowed by the respondent in his statutory notices of deficiency, as shown in our Findings of Fact; and also they are less than those claimed by the petitioner in its returns. In arriving at the amounts of the fair rentals, we have taken into consideration: The size and location of the villages in which the properties were located; the number and locations of the particular properties involved, and their relationship to one another; the uses to which these properties were put; the appearances of the properties and their suitability to such uses; the extent or absence of improvements, such as heating, plumbing, sprinkler systems, and elevators; the testimony of all the witnesses, including their qualifications, their familiarity with the properties, the methods and supporting data employed by the witnesses who expressed opinions regarding the rentals, and the amounts expressed in such opinions; and also all other relevant factors, facts, and circumstances, disclosed by the *315 evidence. The rentals which petitioner actually paid to the Investment Company under the lease, to the extent that they exceed the amounts which we have held to be fair rentals, appear to us to have been the "fruit" of the tax-saving plan which was considered at the time when petitioner and the Investment Company were organized. Account Fry at that time took into consideration and pointed out that the Investment Company would be taxable only at a rate of 30 percent (the normal tax rate for corporations), rather than at a rate of 52 percent (the rate for normal tax plus surtax), if the taxable income of that corporation were not more than $25,000 per year. Actually, the Investment Company's taxable income at no time during the taxable years exceeded the 30 percent bracket; and hence, the larger the rentals agreed upon in the non-arm's length lease, the larger was the portion of the petitioner's taxable income that was shifted from its 52 percent bracket to the Investment Company's 30 percent bracket. The rental rates fixed in said lease remained constant during all years involved, notwithstanding that subsequent to the execution of the lease, several additional properties were made *316 available to the petitioner, one of the properties was improved by the addition of a loading room and rest rooms, lots used for trailer sales were paved, and two of the properties were disposed of. We are satisfied that if petitioner had been dealing at arm's length with a stranger, rather than with a corporation controlled by substantially the same individuals, it would not have "held still" for the rentals provided for in said lease. In addition to the properties which petitioner rented from the Investment Company, it also rented certain other properties from third parties; and in its returns for the years involved it claimed deductions for rent expense in respect of these other properties in the amount of $1,678, $350, $2,410, and $2,423.37, for its fiscal years ended September 30, 1956, 1957, 1958, and 1959, respectively. Since no evidence with respect to these other rentals was presented by either party, and their reasonableness was not contested, we approve the same. Therefore in recomputing the deficiencies for the years involved, deduction shall be allowed both for the rentals set forth in our ultimate finding of fact for the properties leased from the Investment Company, *317 and also for the above-mentioned undisputed rentals for properties leased from third parties. Decision will be entered under Rule 50. Footnotes
*. Most of these rents were received from petitioner, as will be seen from an examination of the preceding table, wherein the rents paid by petitioner to Investment Company are listed.↩
1. None of the three properties on lot 121 actually was mentioned in the lease, as hereinabove found. ↩
2. Increase in rent over preceding year is due to addition of the loading room and rest rooms during fiscal 1958. ↩
3. Rent for 1 month, September 1956. ↩
4. Rent for 6-month period, October 1956 through March 1957. ↩
5. Rent for 5-month period, May through September 1956. ↩
6. Rent for 6-month period, October 1956 through March 1957. ↩
7. Rent for 4-month period, June through September 1957.↩