A. H. PHILLIPS CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
A. H. Phillips Co. v. Commissioner
Docket No. 9282-74.
United States Tax Court
T.C. Memo 1977-150; 1977 Tax Ct. Memo LEXIS 290; 36 T.C.M. (CCH) 638; T.C.M. (RIA) 770150; May 18, 1977, Filed *290 Petitioner was engaged in the men's retail clothing business in Laurel, Del. In December of 1970 it entered into a written lease, effective Jan. 1, 1970, with its principal stockholders for rental of the land and store building occupied by petitioner which provided for rental of 5 percent of gross sales with a minimum and maximum. Held: The amounts paid by petitioner for rental pursuant to the terms of the lease for the years 1971 and 1972 were required payments for the continued use of the property and were reasonable. Held,further: The amounts paid by petitioner as rentals for the year 1970 under the terms of the lease which was executed in December of 1970 were not required payments for the continued use of the property. Robert E. Schlusser, for the petitioner. Robert E. Dallman, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioner's corporate income taxes in the amounts of $10,479.60, $13,680, and $19,233.52 for the years 1970, 1971, and 1972, respectively. Some of the adjustments giving rise to the above deficiencies have been conceded by petitioner. The sole question remaining for decision is to what extent were amounts paid by petitioner to its majority shareholders during the years at issue properly characterized as rents and thus deductible by petitioner under section 162(a)(3), I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The associated exhibits attached to the stipulation of facts are incorporated herein by this reference. Petitioner is a Delaware corporation engaged in the business of retail sales of men's *292 clothing, now and throughout the years at issue, at Laurel, Del. Petitioner filed timely corporate income tax returns for the years at issue with the Internal Revenue Service Center, Philadelphia, Pa.
Petitioner is a closely held and managed corporation. During the years at issue Harold D. Phillips, Sr. (Harold) and his wife, Mary, owned, jointly or separately, a majority of the outstanding stock of petitioner and served as its president and secretary-treasurer, respectively; their sons, David and Harold D., Jr. (Donald), owned the remaining shares outstanding, and Donald Served as petitioner's vice-president. Petitioner's board of directors consisted of Harold, Mary, Donald, and as an honorary member, A. H. Phillips. [2]
The A. H. Phillips Co. was founded by its namesake in 1901 and has continuously *293 engaged in the men's retail clothing business, which was incorporated in 1957. Petitioner's business has always been and continues to be conducted through a store located in Laurel, Del. Laurel is a small town comprised of approximately 3,000 inhabitants; it is located near the southwest corner of the State on State route 24, a short distance from State route 13 (a major traffic artery), approximately 50 miles south of Dover, Del., and 14 miles north of Salisbury, Md. Notwithstanding the relatively nonpopulous immediate area of Laurel, petitioner has conducted a highly successful business operation with substantial gross sales. [3] Petitioner's success is principally attributable to the quality, prices, and especially the vast selection of its inventory, to the decor of its store, and to the caliber of its management and sales persons. Approximately 75-80 percent of petitioner's customers come from outside the Laurel area; its trading area encompassed the region bounded by Dover, Del., 50 miles to the north, the coastal resorts along the Atlantic Ocean approximately 30 miles east, as far as 75 miles south into the Virginia peninsula, and Cambridge, Md., some 35 miles west of Laurel. *294 In 1965, due to the general inadequacy of the building in which petitioner has conducted its operation since beginning in business, petitioner moved its business into a new building at its present location, 115 West Market Street. Petitioner's present location, both the building and the land on which it is situated, is owned jointly by Harold and Mary. The land was purchased in 1964 and the building constructed in 1965 for the specific purpose of housing petitioner's retail operations. Harold and Mary purchased the land for a cost of $14,300; existing improvements which were situated thereon were removed at an unspecified net cost, and the construction cost of the building, which contained 5,000 square feet, was $57,000. The building occupied only the front half of the lot, and the rear wall was constructed so that additions could be made to the building without major reconstruction. In 1972 an addition to the building was constructed which added 3,439 square feet to the store. [4] During the years 1965-1969 petitioner occupied the premises under an oral lease (agreements) with Harold and Mary; *295 petitioner reported rental payments for 1967, 1968, and 1969 of $8,400, $8,400, and $12,999.65, respectively. During the spring of 1970 petitioner was notified by an agent of the Internal Revenue Service that its returns for 1967, 1968, and 1969 had been selected for audit. At that time Harold contacted petitioner's accountant-bookkeeper who, upon being told of the impeding audit, suggested that petitioner associate a larger accounting firm to represent it during the audit and additionally to perform the necessary accounting work for the business which apparently had grown beyond the accountant's capabilities. As a consequence, in April 1970 Harold contacted Robert Faw of Granger, Faw & Co. and retained that firm to represent it in connection with the income tax audit as well as to perform general accounting and management advisory services. Upon examination of accounting data Faw found petitioner's accounting system to be woefully deficient, lacking such basic accounting records as a general ledger. During his examination and evaluation of *296 the accounting system Faw made many suggestions for changes and improvements to the system as well as offering certain operational management advice. In this latter category some of the suggestions made by Faw included the payment of directors' fees for work performed, the formal declaration and payment of dividends to shareholders, neither of which actions had been previously undertaken in the history of the corporation. Additionally, Faw suggested that the adequacy of the rental payments for the land and building occupied by petitioner be evaluated and that a formal written lease agreement be entered into by petitioner and Harold and Mary.[5] Faw suggested that the lease provide for rental based on 5 percent of gross sales, with a minimum and maximum rent specified. Harold, acting in his capacity as president of petitioner, decided to accept a number of the suggestions made by Faw with respect to the accounting system and business practices and adopted certain *297 changes including the payment of directors' fees and the payment of cash dividends. Also in accordance with Faw's suggestion, by December 1970 a decision was made and agreement reached by Harold and Mary, as landlord, and petitioner, as tenant, to enter into a written lease agreement. The lease agreement was executed sometime during December 1970 and provisions, pertinent herein, included the following: (1) The term of the lease was for a period of 5 years, commencing January 1, 1970, and ending December 31, 1974. At the expiration of the initial term, the tenant was granted "the final refusal of a further lease * * * for an additional term upon the terms and conditions then to be established." (2) Annual rent for the property was established at an amount equal to 5 percent of the annual amount of gross sales subject to a minimum annual rental amount of $12,000 and limited by a maximum annual rental amount of $50,000. [6] (3) Other provisions of the lease assigned responsibility to the tenant for the payment of all utility expenses and insurance premiums incurred in connection with the property and to the landlord for the payment of all taxes and assessments levied with respect *298 to the property. Additionally, all maintenance and repairs were to be borne by the tenant and any alterations or improvements to the premises made by the tenant were to become the property of the landlord at their option, at the expiration or termination of the lease. The following schedule depicts the amount of petitioner's gross sales, the amount of rents paid by petitioner for the building and land, the percentage relationships between the amount of rents and gross sales, and the amount of *299 petitioner's taxable income and income tax paid for the years 1967 through 1972, inclusive. 1967
1968
1969
1970
1971
1972
Gross
sales
$390,327.52
$463,632.00
$513,303.63
$606,242.77
$750,940.81
$918,866.93
Rent
paid
8,400.00
8,400.00
12,999.65
30,300.00
38,000.00
46,000.00
Rents
as a
percent
age of
gross
sales
2.15%
1.81%
2.53%
4.998%
5.06%
5%
Taxable
income
18,847.35
19,389.34
31,357.57
38,292.17
40,081.51
59,080.86
Income
tax
paid
4,110.34
4,679.61
9,406.78
12,177.25
12,659.09
20,339.24
In the audit of petitioner's returns for the years 1967, 1968, and 1969 an issue was raised with regard to the salary paid to Harold, which respondent determined to be excessive. There is a conflict in the evidence as to whether Harold or Faw knew that the excess compensation was going to be disallowed before or after the written lease was executed. Petitioner's returns for the years 1970, 1971, and 1972 (the years at issue) were again selected for audit by the respondent. In connection with said audit the examining agent noted the disparity between the deductions claimed on its returns for rental payments in *300 comparison with those which petitioner had reported in the years 1967, 1968, and 1969. The agent was also aware that the revenue service was proposing disallowance of part of the deductions claimed by petitioner for salaries paid to Harold in the years 1967, 1968, and 1969, and formed the opinion that the increased rentals were being substituted for the excessive compensation as deductible business expenses of petitioner. Based upon what he was told about rentals paid for other properties in Laurel and conversations with professionals experienced in real estate leasing in the general geographic area, the agent concluded that a fair rental for the property would be $12,000 for the years 1970 and 1971 and $14,000 for 1972. [7]
In the town of Laurel there are approximately 20 buildings located in a four-block area which make up the business district. The building leased *301 by petitioner (the Phillips building) was the first new commercial construction in Laurel's business district since 1952; the majority of the buildings in the district had been constructed around the turn of the century, and several others were constructed during the 1920's and 1930's.Two other buildings in the business district were of a size comparable to the Phillips building, i.e., the area contained within said buildings was approximately 5,000 square feet. However, no competent or admissible evidence was offered to prove that these buildings were occupied under lease in 1970 or if so, the amount of rent paid or any other lease provisions.
There were no shopping centers in Laurel. The nearest shopping center was the Nylon Capital Shopping Center in Seaford, Del., 8 miles from Laurel. The shopping center covers about 280,000 square feet and contained 25 stores at the time of this trial. Most of the stores in the center were rented under percentage leases calling for 5 percent of gross sales with a minimum rent. Percentage leases for retail establishments were not unusual in the general area surrounding Laurel, although they may have been somewhat unusual in Laurel itself. *302 [8]
Petitioner could have purchased other property in Laurel and constructed a store for itself, but this would have caused some disruption of its business and relocation costs would have been incurred; and no marketing advantages would have been gained by such a move. [9] Petitioner might also have moved to a shopping center, or, preferably a shopping mall, some distance from Laurel, but it would have been required to pay a rental of no less than 5 percent of gross sales. The men's retail clothing business is rather volatile and for that reason stores housing such businesses usually command a relatively high percentage and minimum rent. The advantage of a percentage lease to a tenant is that his rent varies with his sales, and he is able to compute a markup for his inventory to cover his rent. The advantage to the landlord is that he is protected against inflation over the *303 terms of the lease; there is a disadvantage if the tenant's sales drop, which is the reason that mininum rents are usually provided for in percentage leases. The minimum rent is usually fixed as a minimum reasonable return on the landlord's investment, taking into consideration the costs he is obliged to incur. The percentage of gross sales provided in percentage leases varies depending on many circumstances such as location, terms of the lease (whether a net lease or whether the landlord pays the taxes and some other costs), competition, the type of business, the anticipated volume of business, etc. ULTIMATE FINDINGS OF FACT The rent provided for in the written lease entered into between petitioner and the Phillips Co. in December of 1970 was reasonable. The amounts of rent paid by petitioner under the lease for 1971 and 1972 was in fact rent for the use of the premises. The amount paid by petitioner as rent in 1970 in excess of $12,000 was not in fact rent required to be paid for the use of the property. OPINION Petitioner engaged in the business of retail sales of men's wearing apparel from a store located in Laurel, Del. Petitioner occupies its business premises *304 under a lease agreement with its majority shareholders, Harold and Mary Phillips. The subject lease agreement provided for annual rent, payable in monthly installments, equal to 5 percent of petitioner's gross sales, subject to a minimum amount of $12,000 and a maximum amount not to exceed $50,000 per year. Pursuant to the terms of the lease agreement petitioner paid and claimed deductions for rent in the amounts of $30,300 in 1970, $39,200 in 1971, and $47,642.43 in 1972. Respondent determined that the amount of rent paid by petitioner to its majority shareholders was excessive and disallowed deductions claimed therefor to the extent they exceeded $12,000 for each of the years 1970 and 1971 and $14,000 for 1972. Section 162(a)(3) allows a deduction as an ordinary and necessary business expense for amounts paid or incurred as rentals or other payments required to be made for use of property used in a trade or business. [10]
*305 In Place v. Commissioner,17 T.C. 199, 203 (1951), affd. per curiam 199 F. 2d 373 (6th Cir. 1952), cert. denied 344 U.S. 927 (1953), this provision of the law was interpreted as follows: The basic question is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. The inquiry is whether the petitioner was in fact and at law "required" to pay these sums as rent. * * * When there is a close relationship between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. * * * [Fn. ref. and cits. omitted.] See also Mackinac Island Carriage Tours, Inc. v. Commissioner,455 F. 2d 98 (6th Cir. 1972), revg. a Memorandum Opinion of this Court. Respondent contends that examination *306 of two factors is crucial in determining whether or not the rental payments made by petitioner were reasonable under the circumstances and thus were required as rent in their entirety or were made for some other purpose: (1) The amount paid by petitioner as rent for the years prior to those at issue herein; and (2) the amount of rental income which would constitute a reasonable rate of return in Laurel and the immediately surrounding area, on a landlord's investment in property similar to the Phillips store premises. Respondent argues that the amount of rents paid during the years at issue are palpably unreasonable as demonstrated by the sharp increase in the rents payable over the amounts which were paid during the preceding years of 1967, 1968, and 1969. Additionally, the average annual rental income received by Harold and Mary over the period 1970-1972 yielded an annual return on their investment of approximately 42 percent; another way of viewing the situation is that Harold and Mary would realize a payback of their investment over a 2-1/2 year period.
We disagree with respondent. From an application of the test enunciated in Place v. Commissioner,supra, *307 to the facts of this case, we conclude that the amounts paid by petitioner and characterized as rent for the years 1971 and 1972, years in which the written lease agreement was outstanding and effective during the entire periods, were reasonable and constituted deductible rental payments in their entirety. However, for 1970, the year in which the lease agreement was first applicable by executing said agreement in December and making it effective as of January 1 of that year, we sustain respondent's deficiency as discussed. Both parties presented evidence bearing on the question of what amounts of rent for the premises in question for the years 1970, 1971, and 1972 constituted reasonable rents. Respondent called two witnesses as experts at trial, the first of whom was Elmer E. Horsey. Horsey is the general manager of the Nylon Capital Shopping Center located in Seaford, Del., approximately 8 miles north of Laurel. Horsey's responsibilities included acting as the leasing agent for the shopping center. Horsey testified that the amount of rent charged to a tenant in the shopping center was determined on the basis of a consideration of three factors: (1) Construction costs of the *308 building; (2) the landlord's expected rate of return on its investment - 10 percent; and (3) a survey of the rents in the market area. Presumably based upon these criteria and his knowledge of petitioner's business and the general amount of its gross sales, Horsey stated that if petitioner had sought to lease approximately 5,000 square feet of space in the Nylon Capital Shopping Center in 1970 he would have requested annual rent of 5 percent of gross sales but might have settled for 3 percent because of the probable increased sales of other tenants as a result of petitioner's drawing power. During the years at issue the two leading tenants of the shopping center were F. W. Woolworth Co. - 5 and 10 cent store, and Peebles - a soft goods retailer which sold men's, women's, and children's clothing and sundry items. Peebles leased 18,750 square feet and paid annual rent equal to 3 percent of its yearly gross sales; average annual gross sales for the concerned 3-year period were approximately $1,000,000. Woolworth leased 18,000 square feet in the shopping center and paid annual rent equal to 5 percent of its gross sales which averaged approximately $1,333,000 for the years 1970, 1971, *309 and 1972. All of the other tenants of the Nylon Capital Shopping Center also occupied space under leases with provisions for rent based on a percentage of gross sales which, in all instances brought to our attention, was 5 percent or more. Most of the leases also provided for a certain minimum amount of rent regardless of sales; Horsey testified that the minimum rent was determined as the landlord's break-even point. Respondent's other expert witness was Robert S. Shipley, Jr., a real estate appraiser for the engineering and evaluation branch of the Internal Revenue Service. Shipley had prepared a written valuation report of the fair rental value of the Phillips building and land received as an exhibit herein and at trial testified as to the method used in compiling said report. As the basis for making his evaluation, Shipley began with the proposition that the annual fair rental value of property is that amount of rent which will yield a "fair rate of return" to the landlord based on his investment in the property. Using a weighted average of prevailing long-term interest rates and an assumed 15-percent return on equity, Shipley computed a fair rate of return in this type *310 of investment as 10.58 percent for 1970, 10.17 percent for 1971, and 9.60 percent for 1972. Applying these percentage rates to the fair market value of the land and to a modified cost of the building and making certain other adjustments, Shipley determined a fair rental value of $22,200 for 1970 and 1971 and $25,500 for 1972. Petitioner called Norman W. Peters as its expert witness. Peters is employed as a national leasing consultant for several real estate investors and developers and also as a management and leasing consultant to the Association of Men's Wear Retailers of America. Peters has extensive experience in leasing commercial real estate throughout the United States and, while he is generally familiar with real estate and leasing arrangements throughout the State of Delaware, he has no specific experience or knowledge with respect to property located in Laurel, Del. Peters testified as to the generally accepted use in lease agreements for property used in the men's retail clothing business of rental provisions requiring the amount of rent to be determined as a percentage of the gross sales from the business; such rental provisions are commonly found throughout the *311 marketing area in which petitioner does business. Peters believes that conceptually percentage lease agreements are fair to both landlords and tenants because the factors of inflation and business fluctuations are taken into account in determining the amount of rent paid. As to the specific terms of the rent provisions in such a lease agreement, Peters articulated two criteria by which to measure their "reasonableness" - the minimum rent should be that amount which allows the landlord a reasonable rate of return of his investment in the property; and the stated percentage of gross sales provided, limited by the absolute maximum dollar amount, should be no greater than that which is customary in the market place. Based upon these criteria, Peters was of the opinion that the rental provisions of the Phillips' lease were reasonable; the minimum rent provided Harold and Mary with a rate of return of approximately 10 percent on their investment in the land and building and rent at 5 percent of gross sales was customary for men's retail clothing outlets throughout the United States, including petitioner's market area. We agree with respondent that the amount of rent paid by petitioner *312 during years prior to those at issue is relevant and believe that respondent's concern and doubts with respect to the increased rent were justified. Nevertheless, the disparity between the rentals paid does not necessarily mean that the lesser amount was a reasonable sum, or that the greater amount was unreasonable and consequently included payments other than for rent. In 1970 petitioner retained a new accounting firm which made a thorough examination of petitioner's accounting system as well as offered managerial consulting services. Based upon experience with rental properties in the general area in which petitioner was located and did business, the accountants were of the opinion that the rental paid by petitioner was low in comparison and suggested a rental provision of 5 percent of gross sales. We believe the reasonableness of the rent in question basically turns on the question of whether such a rent provision was customary and acceptable under the particular circumstances present in this case. In general, lease agreements providing for percentage rents for commercial properties have *313 long been accorded recognition by this Court. See, for example, Imerman v. Commissioner,7 T.C. 1030 (1946); Southern Ford Tractor Corporation v. Commissioner,29 T.C. 833 (1958). This is particularly true where a reasonable maximum for the rent computed under the formula is provided for in the lease, as here. The obvious principal characteristic of these leases is the direct relationship between the amount of rent and business conditions--the rent is greater in years when business is good and less when business declines. Indeed, it is this characteristic that makes such leases attractive to both landlords and tenants. We believe respondent puts too much emphasis on the alleged reason petitioner entered into this lease and was too much influenced by his knowledge that the reasonableness of compensation paid to Harold was being questioned for the years 1967-1969. In the first place, we are not concerned with why petitioner entered into the lease, but rather whether the rental provided in the lease was actually required to be paid for the use of the property. Secondly, the evidence is not at all convincing that petitioner's representatives knew *314 that a part of Harold's salary for the previous years would be determined to be excessive; the revenue agent's report was not received until after the lease was signed and the prior years' audit was not settled until a year or so later. If petitioner's reasons for entering into the lease are relevant, we are convinced from the evidence before us that the fixed rental paid under the oral lease was not reasonable or fair to the landlord and that a percentage lease was more consistent with current business practices in the area. While the dollar amounts of the rentals paid by petitioner for property located in a town as small as Laurel raise our suspicions and to be sure the return on the landlord's investment was high, nonetheless we find that petitioner has proved that the percentage rent provision in the lease agreement was an acceptable and customary practice in lease arrangements between nonrelated landlords and tenants dealing at arm's length around the geographic area in which the store premises were situated. We are also convinced that there exists no property comparable to the Phillips building in the town of Laurel. Although respondent argues that there were perhaps one *315 or two comparable buildings, the scant amount of evidence received with respect to alleged comparability falls far short of being convincing; moreover, absolutely no admissible evidence was offered pertaining to any rental arrangements that may have existed regarding these alleged comparable buildings. Persuasive evidence was presented at trial to the effect that had petitioner decided to move its business to another rental location in 1970 within its marketing area, it would have been required to enter into a lease agreement with the same rental provision, requiring 5 percent of gross sales, and probably containing other terms less favorable than those in the agreement with Harold and Mary. [11] For example, under business conditions as they then existed, a landlord would probably have required a longer lease term, decreasing petitioner's flexibility, and almost surely would have required petitioner to pay the taxes on the property. The fact that much of this evidence was elicited from one of respondent's own expert witnesses adds to its persuasiveness. However, we feel it important to emphasize the rather unique circumstances of this case based on the record before us in that *316 no valid comparisons could be made with rental properties in the town of Laurel itself. We are confident that normally comparable properties will exist and comparisons can be and should be made in order to provide a measuring rod by which to determine the reasonableness of rent paid. Notwithstanding our finding that the amount of rent provided under the written lease agreement was reasonable and our conclusion therefrom that the amounts paid during 1971 and 1972 as rent were not in fact for something else, the same is not true for the year 1970. The change in the rental provision was first suggested to Harold by the accountant sometime in April or May of 1970, and Harold testified that final decision to enter into a new lease agreement was made by him in December 1970. The lease agreement was then executed in December but made effective retroactively to January 1, 1970. Under these circumstances, we cannot find that any amount paid by petitioner in excess of the rent it was actually *317 paying throughout the year under the then-existing oral lease agreement was in fact "required" as rent. Cf. Place v. Commissioner, supra.Petitioner was simply not obligated to pay a percentage of its gross sales as rent until the time the final decision was made to adopt a new lease agreement and it was in fact executed. Applying a standard of arm's-length dealing obviously requires us to sustain respondent's determination for the year 1970. In accordance with our conclusions herein, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise specified.↩
2. A. H. Phillips, Harold's uncle, was the founder of the business. From the time of petitioner's incorporation until 1968, A. H. and Harold each owned 50 percent of the outstanding stock and A. H. served as president of the corporation. Pursuant to an agreement made in 1968, A. H. sold all of his stock to Harold and/or Mary in installments paid during 1968 and 1969.↩
3. See some statistics for the periods 1967 through 1972, infra↩ on p. 9.
4. The cost of the addition was $41,826; however, it appears from the record that the petitioner-tenant incurred this expenditure.↩
5. As is often the case with respect to closely held corporations, advice sought or obtained in connection with the corporation's business necessarily directly involves business advice to the individual shareholders.↩
6. The actual language appearing in the executed lease agreement provided for a "basic rent" of $12,000 per annum and an "additional rent" of 5 percent of gross sales limited to an aggregate maximum amount of $50,000 per year. However, both Harold and the accountant who conceived the rental provision testified that the written provision was in error, and that the percentage rental was to include the minimum. It is clear from the evidence that the rent actually paid was computed in accordance with the provision described in the text above, despite the fact that there were minimal variances in the rent actually paid and precise computations of the rent due under the percentage formula.↩
7. The agent's application of the payback method was obviously not made with a great degree of precision; he used $60,000 as the amount of the investment for the years 1970 and 1971 and used some method of adjustment for the cost of the addition - $41,826, to allow an additional $2,000 rental payment for 1972.↩
8. No admissible evidence was offered to prove the type of leases used or the amount of rent paid for stores in Laurel.↩
9. Petitioner's store is located in the middle of the business district of Laurel on the principal business street. It had been located in that vicinity for about 65-70 years.↩
10. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- * * *
(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. * * *↩
11. Harold testified that, as president of petitioner, he had attempted to lease space for a store for petitioner in a shopping center in 1973 and was asked for 5 percent of sales as rent.↩